**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEBRASKA**
**OMAHA DIVISION**

| | | |
|---|---|---|
| **U.S. COMMODITY FUTURES**<br>**TRADING COMMISSION,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | |
| | ) | |
| **JONATHAN W. ARRINGTON;** | ) | |
| **MICHAEL B. KRATVILLE;** | ) | |
| **MICHAEL J. WELKE;** | ) | |
| **ELITE MANAGEMENT HOLDINGS CORP.;** | ) | |
| **and MJM ENTERPRISES LLC,** | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**COMPLAINT FOR INJUNCTIVE RELIEF, CIVIL MONETARY PENALTIES,**
**AND OTHER EQUITABLE RELIEF**

Plaintiff U.S. Commodity Futures Trading Commission (CFTC) alleges as follows:

## I.   SUMMARY

1.     Jonathan W. Arrington (Arrington), Michael J. Welke (Welke), and Michael B. Kratville (Kratville)—using numerous investment pools operated by defendants Elite Management Holdings, Corp. (EMHC) and MJM Enterprises LLC (MJM), both of which were unregistered commodity pool operators (CPOs)—orchestrated a fraudulent scheme that induced more than 130 pool participants, the majority of whom are from the greater Omaha, Nebraska area, to invest at least $4.7 million in the pools.  Arrington, Welke, and Kratville owned, operated, and controlled EMHC and MJM.  Defendants solicited members of the public to invest in pools operated by EMHC and MJM, and these pools, per defendants' solicitations, would purportedly trade in commodity futures contracts (futures) and off-exchange foreign currency

contracts (forex).  It appears these pools actually traded futures, forex, and options.  The
fraudulent scheme lasted from at least approximately August 2005 to at least July 2008.

2.      To entice prospective pool participants and retain pool participants, defendants
touted, among other things, their supposed extensive skills and experience in market analyses
and investment strategies and the supposedly extremely successful historical performance of
their futures and forex trading models and strategies.  In addition, defendants claimed to
prospective pool participants and pool participants that their trading returns had met or had
exceeded three percent every month from May 2002 through at least June 2007.  Defendants also
stressed to prospective pool participants and pool participants that they had sophisticated
procedures to prevent losses and that losses would be limited because no more than ten percent
of their principal would ever be at risk.

3.      Defendants, however, did not trade futures, forex, or options successfully.  Not
only did defendants fail to generate returns of three percent or more each and every month from
May 2002 until at least June 2007, defendants' trading and the trading conducted on defendants'
behalf resulted in nearly a total loss for every pool participant.  Further, more than ten percent of
the pool participants' funds were at risk throughout the operation of defendants' fraudulent
scheme.  In fact, trading losses during a single month exceeded ten percent of a particular pool's
total funds on several occasions.

4.      Instead of disclosing the pools' actual trading performance, defendants
periodically provided pool participants with account statements that stated false returns and false
account balances over the course of the fraudulent scheme.

5.     Defendants misappropriated pool participant funds by using such funds for personal use (including for golf country club memberships and foreign travel) and to pay other pool participants, in furtherance of defendants' fraudulent scheme.

6.     By misappropriating pool participant funds; making false written and oral statements to prospective pool participants and pool participants regarding the pool's purported trading activity, performance, and account balances; making fraudulent misrepresentations about the risks of trading futures and forex; failing to register as a CPO; failing to register as associated persons (APs) of a CPO; and failing to comply with pool disclosure and reporting requirements, Arrington, Kratville, Welke, EMHC (by and through Arrington, Kratville, and Welke), and MJM (by and through Arrington, Kratville, and Welke) engaged in acts and practices that violated anti-fraud and other provisions of the Commodity Exchange Act (Act), 7 U.S.C. § 1 *et seq.* (2006); the Act, as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, Title XIII (the CFTC Reauthorization Act (CRA)), § 13102, 122 Stat. 1651 (effective June 18, 2008), to be codified at 7 U.S.C. § 1 *et seq.*; and CFTC Regulations promulgated thereunder (Regulations), 17 C.F.R. § 1.1 *et seq.* (2010).

7.     Arrington, Kratville, and Welke committed the acts, omissions, and failures described herein within the course and scope of their agency, employment, or office with EMHC and MJM; therefore, EMHC and MJM are liable under Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(A)(1)(B), and Regulation 1.2, 17 C.F.R § 1.2 (2010), as principals for their agents' violations of the Act and the Regulations.

8.     Arrington, Kratville, and Welke are liable under Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), as controlling persons of EMHC and MJM, for EMHC's and MJM's violations of the Act and the Regulations, because Arrington, Kratville, and Welke did not act in

good faith or knowingly induced, directly or indirectly, the acts constituting the violations committed by EMHC and MJM.

9.      Accordingly, the CFTC brings this action pursuant to Section 6c of the Act, to be codified at 7 U.S.C. § 13a-1, as amended by the CRA and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, Pub. L. No. 111-203, Title VII (the Wall Street Transparency and Accountability Act of 2010 (Dodd-Frank)), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 1 *et seq.*, to enjoin defendants' unlawful acts and practices and to compel compliance with the Act, as amended, and the Regulations.  In addition, the CFTC seeks civil monetary penalties and remedial ancillary relief, including, but not limited to, trading and registration bans, restitution, disgorgement, rescission, pre- and post-judgment interest, and such other relief as the Court may deem necessary and appropriate.

10.     Unless restrained and enjoined by this Court, defendants are likely to engage in the acts and practices alleged in this Complaint or in similar acts and practices, as described more fully below.

## II.      JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, which provides that whenever it shall appear to the CFTC that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or the Regulations, the CFTC may bring an action in the proper district court of the United States against such person to enjoin such practice, or to enforce compliance with the Act, and the Regulations.

12.     Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because at least some of the acts and practices in violation of the Act and the Regulations have occurred within this District.

### III.    PARTIES

13.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Act, as amended, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*  The CFTC maintains its principal office at Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

14.     Defendant **Elite Management Holdings Corp.** was a Nebraska corporation formed on August 16, 2005, with its principal place of business in Omaha, Nebraska.  Arrington, Kratville, and Welke owned and controlled EMHC.  It was purportedly "established to provide conservative investors with an opportunity to invest a small portion of their investment portfolios in an aggressively managed investment account with the potential for higher overall yields."  EMHC engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodities for future delivery or commodity options on or subject to the rules of any contact market.  EMHC acted as the controlling and general partner for at least the following investment pools:  Elite Aggressive Growth Group LP (EAAG); Elite Management Investment Fund LP (EMIF), and Elite Index Investment Group LP (EIIG).  EMHC has never been registered with the CFTC.

15.     Defendant **MJM Enterprises LLC** was a Wyoming limited liability company formed on May 25, 2006, with a principal place of business in Omaha, Nebraska.  Arrington,

Kratville, and Welke owned and controlled MJM, which engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodities for future delivery or commodity options on or subject to the rules of any contact market. MJM acted as the controlling and general partner for at least the NIC LLC (NIC) investment pool. MJM has never been registered with the CFTC.

16.     Defendant **Jonathan W. Arrington**, a resident of Omaha, Nebraska, was an equal owner and president of EMHC and president/managing partner of MJM. He jointly operated or controlled (directly or indirectly) EMHC and MJM, with Welke and Kratville. Additionally, Arrington was a self-identified trader for the various pools used by defendants. In association with both EMHC and MJM, Arrington served as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds for participation in pools operated by EMHC and MJM. Arrington has never been registered with the CFTC.

17.     Defendant **Michael B. Kratville**, a resident of Omaha, Nebraska, was an equal owner, secretary, and treasurer of EMHC and vice president/managing partner of MJM. He jointly operated or controlled (directly or indirectly) EMHC and MJM, with Arrington and Welke. Additionally, Kratville was a self-identified trader for the various pools used by defendants. In association with both EMHC and MJM, Kratville served as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds for participation in pools operated by EMHC and MJM. Kratville has never been registered with the CFTC.

18.     Defendant **Michael J. Welke**, a resident of Omaha, Nebraska, was an equal owner and vice president of EMHC and vice president/managing partner of MJM. He jointly

6

operated or controlled (directly or indirectly) EMHC and MJM, with Arrington and Kratville. Additionally, Welke was a self-identified trader for the various pools used by defendants. In association with both EMHC and MJM, Welke served as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds for participation in pools operated by EMHC and MJM. Welke has never been registered with the CFTC.

## IV.   FACTS

### Initial Corporate Structure and Plan

19.    In or around the late summer of 2005, Arrington, Kratville, and Welke met at Kratville's house and decided to form multiple investment pools that they would use to solicit money from others and invest with FX Investment Group (FXIG), who purportedly traded in the futures and spot markets for commodities, precious metals, and foreign currency. To carry out their scheme, EMHC, an unregistered CPO, and Arrington, Kratville, and Welke, unregistered APs of EMHC, initially used three pools—EAGG, EIIG, and EMIF (collectively, Elite Entities), which were all portrayed as investment clubs, formed as limited partnerships, in which pool participants supposedly would become partners.

20.    EMHC was the general partner of the Elite Entities. Through their ownership of EMHC, Arrington, Kratville, and Welke exerted total control over the Elite Entities. For example:

      a.   all three agreed that the Elite Entities' funds would be traded by FXIG;

      b.   all three were signatories on the bank accounts for the Elite Entities; and

      c.   all three actively solicited individuals to become pool participants of the Elite Entities.

Further, Arrington, Kratville, and Welke represented to pool participants and prospective pool participants that the three of them controlled the Elite Entities.

**Solicitations for the Elite Entities**

21.     In or around late summer of 2005, Arrington, Kratville, and Welke began soliciting prospective pool participants to trade futures and forex through the Elite Entities. When soliciting prospective pool participants, EMHC—by and through Arrington, Kratville, and Welke—touted, among other things, their own extensive and successful experience trading futures and forex, the superior methodology of their program, the long and successful track record of their program, and their ability to greatly limit risk while delivering above average returns. Pool participants received a brochure that described the pools' trading strategy and stated that "[t]his strategy has had many multi-million [sic] offers to buy the system, but the desire has been, and still is to help the small guy get his children through school and to remain entirely proprietary."

22.     Their solicitations often included a discussion of the Elite Entities' return structure. Pool participant returns were to be capped based on the amount of funds the pool participant invested with the Elite Entities. For example, one then-prospective pool participant was told that if she invested between $10,000 and $25,000, her returns would be capped at four percent monthly, if she invested between $25,000 and $50,000, her returns would be capped at five percent monthly, and if she invested more than $50,000, her returns would be capped at six percent monthly. The percentage caps also were referred to as the return goals or the target returns. Although representations about the required investment and percent returns varied, nearly every solicitation included a representation that the Elite Entities had met the target returns each and every month for several years.

23.     The representations made by EMHC—by and through Arrington, Kratville, and Welke—were completely false.  EMHC, Arrington, Kratville, and Welke did not have extensive, successful experience trading futures and forex, they did not have a program with a long successful track record or one that could greatly limit trading risks, and there were no offers to buy their nonexistent, proprietary trading program.  Further, the Elite Entities had not made their target return goals each and every month for several years, as claimed by defendants; rather: (1) trading had been occurring by or on behalf of the Elite Entities for only a few months; (2) the earliest Elite Entity was not even created until February of 2004; and (3) the earliest Elite Entity pool participant was solicited in or around the late summer of 2005.  EMHC, Arrington, Kratville, and Welke knew these representations were false.

24.     EMHC—by and through Arrington, Kratville, and Welke—told prospective pool participants and pool participants that EMHC (and Arrington, Kratville, and Welke via their ownership of EMHC) would not be compensated unless pool participants received their target returns.  Their compensation was purported to be all trading returns in excess of the target returns (*i.e.*, if the purported monthly return was 10 percent, then their compensation would be the difference between 10 percent and the stated target return).

25.     EMHC—by and through Arrington, Kratville, and Welke—also told prospective pool participants and pool participants that any expenses incurred by or for the Elite Entities would be paid by EMHC, rather than out of the pooled funds or the pool participants' share of the returns.  Despite these promises, Arrington, Kratville, and Welke used pooled participant funds to operate the pool and to fund long trips to Europe for Arrington and Welke.

26.     EMHC—by and through Arrington, Kratville, and Welke—told prospective pool participants and pool participants there was little risk in investing with the Elite Entities because

only 5-10 percent of their funds would be invested at any one time.  Each of these statements

was false.

27.     In addition to the above, EMHC—by and through Arrington, Kratville, and

Welke—made other representations to prospective pool participants and pool participants:

- Arrington told prospective pool participants and pool participants that the Elite Entities met the maximum target return of 6% for at least 42 consecutive months as of the fall 2005.  He claimed the year-to-date returns, with compounding, in 2005 were 53.9% for customers at the 4% per month target-return level, 71.0% at the 5% per month target-return level, and 89.8% at the 6% per month target-return level.  These statements were false;

- Some prospective pool participants and pool participants were referred to Welke by Arrington and Kratville.  On those occasions, Welke acted as a reference for the Elite Entities, but did not disclose his interest and role with the Elite Entities.  Rather, he posed as a like-minded pool participant with money invested in the Elite Entities for the long haul.  He purported to provide an impartial reference vouching for Arrington's character; and

- Kratville told at least one then-prospective pool participant that he spent ten years developing and testing the trading program that the Elite Entities used and that the program had been making the target returns between four and five percent per month and sixty percent annually for the past forty months as of April 2006.  Kratville also said that several companies offered to buy the program, but Kratville refused to sell it because the program was making so much money that there was no need to sell it.  In addition, Kratville told the then-prospective pool participant that he was friends with Warren Buffet and that Warren Buffet's children invested with the Elite Entities.  These statements were false.  After the then-prospective pool participant decided to invest, Kratville referred him to Arrington to open the account.

28.     EMHC—by and through Arrington, Kratville, and Welke—provided prospective

pool participants and pool participants with written marketing materials describing the Elite

Entities.  These materials made several of the same misrepresentations described above, about

the purported performance of the Elite Entities, target-return tiers, and purported excellent risk

versus return.

**Elite Entities Pool Participant Statements**

29.     EMHC—by and through Arrington, Kratville, and Welke—emailed pool participants a monthly newsletter that discussed the Elite Entities' previous month's trading results, year-to-date returns, and that the target returns had been achieved for a certain number of consecutive months.  For example, on November 7, 2005, Welke emailed an October 2005 newsletter to a pool participant that stated the Elite Entities hit the "maximum target goal of 6% for the 42nd consecutive month" and that the year-to-date returns at the three target return levels were 53.9% at the 4% target, 62.9% at the 5% target, and 79.1% at the 6% target.  Each of these statements was false.

30.     Elite Entities' pool participants also logged into their individual accounts on the Elite Entities' website (www.emholdings.com) to view, among other things, their account statements.  In addition, at least one pool participant received his account statements by mail. The account statements purported to show pool participants' investment growing by the percentage return goal, compounded every month.  The online and mailed statements viewed by several of the Elite Entities' pool participants showed purported gains every month from October 2005 through May 2006 that ranged from 2 percent to 6 percent.  Each of these statements was false.

**The Elite Entities Become MJM and NIC**

31.     On May 12, 2006, the State of Nebraska Department of Banking and Finance (Nebraska) sent EMHC a letter notifying EMHC that the sale of limited partnership investments implicated state law.  Nebraska sought information from EMHC, including, among other things, to "identify the names and addresses of all officers of [EMHC], including the Executive Trader

and trading group."  In the letter, Nebraska also stated that EMHC was prohibited from selling interests in the investment pool until the matter was resolved.

32.     On May 26, 2006, in response to the letter from Nebraska, Kratville, as the attorney for and an owner of EMHC, made several representations, including that: (1) Arrington, Kratville, and Welke were the sole officers of EMHC; (2) Arrington, Kratville, and Welke were the trading group; (3) Arrington was the senior or executive trader because of his past experience with investment clubs; and (4) Kratville and Welke "have extensive trading experience. . . ."  EMHC also agreed not to make any further offers or sales of investments in the Elite Entities.  Kratville and Welke, acting on behalf of the Elite Entities, also met with Nebraska and reiterated those representations.  Nebraska insisted the Elite Entities shut down because the Elite Entities were not operated in accordance with state law.

33.     At about the same time that Arrington, Kratville, and Welke purported to shut down EMHC and the Elite Entities, they started a new group of entities—NIC LLC (NIC) and MJM Enterprises LLC (MJM)—to continue their fraudulent scheme.  Similar to the Elite Entities, NIC was the investment pool, in which pool participants invested, and MJM was the controlling member that managed NIC.  Arrington, Kratville, and Welke equally owned MJM. Through their ownership of MJM, Arrington, Kratville, and Welke exerted total control over NIC.

34.     Rather than tell Nebraska about NIC and MJM, Arrington, Kratville, and Welke led Nebraska into believing they were following Nebraska's directive.  While setting up NIC and MJM and to demonstrate that the Elite Entities were shutting down, Arrington, Kratville, and Welke asked each pool participant for a notarized signature acknowledging, falsely, that the Elite Entities had returned that pool participant's funds.  Arrington, Welke, and Kratville then

convinced the Elite Entities' pool participants into signing the documents, by among other things, lying about why Nebraska sought to shut down the Elite Entities.  On the same day that Arrington, Kratville, and Welke sent the letter seeking a notarized signature from the Elite Entities' pool participants, the three sent a second letter to the pool participants, in which they provided a purportedly "accurate rollover balance" and cautioned further that "[t]his is an internal document for you only.  Do not provide this information to anyone."

35.     In August and September 2006, EMHC—by and through Kratville—forwarded to Nebraska the notarized documents with the Elite Entities' pool participants' acknowledgement that their funds had been returned.  EMHC—by and through Kratville—also informed Nebraska that Arrington, Kratville, and Welke decided to dissolve EMHC and the Elite Entities. Arrington, Kratville, and Welke did not disclose to Nebraska that they had started MJM, an unregistered CPO (for which they were unregistered APs), and NIC.

**NIC and MJM Continued to Use Misrepresentations in Soliciting Customers**

36.     Upon information and belief, from July 2006 until at least September 2007, MJM—by and through Arrington, Kratville, and Welke—made substantially similar representations to prospective pool participants and pool participants of NIC (as they had done to pool participants and prospective pool participants of the Elite Entities), including representations that pool participants' funds would be traded in futures and forex, that investment pools they controlled had been extremely profitable and had met or exceeded target returns for several years, and that no more than 10 percent of a pool participant's money would be at risk at any one time.  MJM, Arrington, Kratville, and Welke each knew that each of these representations was false.

37.     Further, MJM—by and through Arrington—represented the following to certain pool participants regarding NIC's trading:

- that Arrington was NIC's trader and that he developed the trading program that NIC used;

- that he tested the program for over a year using his father's money to trade;

- that he was offered several million dollars to sell the program, but he refused because he could make more money using it himself; and

- that the program had never lost money.

Each of these representations was false.

38.     MJM—by and through Arrington—also represented the following to certain pool participants:

- that Arrington used to do all of the trading himself, but became too busy handling other aspects of the business;

- that NIC employed traders, who traded 24 hours a day, seven days a week;

- that in the beginning, NIC employed six of the top ten traders in the world, but as of March 2007, NIC employed nine of the top ten.

Each of these statements was false.

## MJM and NIC Customer Statements

39.     Many NIC pool participants accessed their account statements through the NIC website (www.nicllc.org) and at least one pool participant received statements via mail. The statements included, among other things, the principal contributed by the pool participants, the purported monthly returns expressed as both a percentage and dollar amount, and the ending balances. The statements provided to at least several NIC pool participants showed gains every

14

month from January 2006 through June 2007 that ranged from 3.01% to 4.5%. The monthly returns as expressed in dollars and month-end balances also reflected these purported gains. These statements were all false.

40.     Beginning in November 2006 and continuing through August 2007, NIC traded forex and options with newly acquired pool participant funds. NIC, Arrington, Kratville, and Welke, however, never told pool participants that their funds would be used to trade options. Moreover, contrary to the statements provided to pool participants, there were numerous months in which trading on behalf of NIC resulted in significant losses.

41.     Further, the NIC statements provided to those NIC pool participants who were former Elite Entities' pool participants were false. The account balances and returns on the NIC statements did not reflect that the trading on behalf of the Elite Entities ultimately resulted in a total loss; instead, the NIC statements to former Elite Entities' pool participants purported to show principal (that, in fact, had already been lost) and consistent gains (that did not exist).

42.     By July 2007, NIC's forex and options trading had resulted in a total loss as well. MJM—by and through Arrington—informed NIC pool participants of this total loss beginning in or about October 2007. However, MJM—by and through Arrington—continued to falsely represent, as late as at least July 2008, the timing of the pool participants' losses.

43.     In total, defendants lost almost $3 million (including fees and commissions) trading futures, forex, and options on forex with the Elite Entities pool participants' and NIC pool participants' funds.

44.     Through their fraudulent scheme, defendants misappropriated more than $1.5 million in pool participant funds. They used, at a minimum, more than $700,000 in pool participant funds to, among other things, pay for golf club memberships, travel, and dining for

Arrington, Kratville, and Welke; cover various other expenses on behalf of all defendants; and pay themselves and their family members.  In addition, defendants used more than $850,000 in pool participant funds to make Ponzi payments to certain pool participants.

45.    With respect to defendants' forex-related conduct on or after June 18, 2008, neither defendants nor the FCMs that were counterparties to the forex transactions entered into and /or contemplated by defendants and the pool participants were financial institutions, registered broker dealers (or their associated persons), insurance companies, bank holding companies, or investment bank holding companies.

46.    Furthermore, neither defendants nor the pool participants who provided funds to the defendants were "eligible contract participants" as that term is defined in the Act.  *See* Section 1a(12)(A)(v) of the Act, to be codified at 7 U.S.C. § 1a(12 (an "eligible contract participant," as relevant here, is "a corporation . . . that has total assets exceeding $10,000,000 . . ." or an individual with total assets in excess of (i) $10 million, or (ii) $5 million and who enters the transaction "to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual").

47.    Finally, defendants traded foreign currency on a margined or leveraged basis in the trading accounts containing pool participants' funds.  The foreign currency transactions conducted by defendants neither resulted in delivery within two days nor created an enforceable obligation to deliver between a seller and buyer that had the ability to deliver and accept delivery, respectively, in connection with their lines of business.  Rather, these foreign currency contacts remained open from day to day and ultimately were offset without anyone making or taking delivery of actual currency (or facing an obligation to do so).

## VIOLATIONS OF THE ACT AND REGULATIONS

### COUNT ONE—AGAINST ALL DEFENDANTS
### FRAUD IN CONNECTION WITH FUTURES AND FOREX

**Violations of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), and Section 4b(a)(1)(A)-(C) and 4b(a)(2)(A)-(C) of the Act, as Amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C) and 7 U.S.C. § 6b(a)(2)(A)-(C)**

48.     The allegations set forth in paragraphs 1 through 47 are re-alleged and

incorporated herein by reference.

49.     With respect to conduct occurring prior to June 18, 2008, Section 4b(a)(2)(i)-(iii)

of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), makes it unlawful

> for any person, in or in connection with any order to make, or the making of any contract of sale of any commodity for future delivery, made or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity, or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped or received in interstate commerce for the fulfillment thereof –
> (i) to cheat or defraud or attempt to cheat or defraud such other person;
> (ii) willfully to make or caused to be made to such other person any false report or statement thereof, or willfully to enter or caused to be entered for such other person any false record thereof;
> (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person.

50.     With respect to conduct occurring on or after June 18, 2008,

Section 4b(a)(1)(A)-(C) and Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be

codified at 7 U.S.C. § 6b(a)(1)(A)-(C), make it unlawful

> (1) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce or for future delivery that is made, or to be made, on or subject to the rules of a designated contract market, for or on behalf of any other person; or

17

(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market–

    (A) to cheat or defraud or attempt to cheat or defraud the other person;

    (B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record;

    (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person.

51.    As described above, beginning in approximately August 2005 and continuing through at least July 2008, Arrington, Kratville, Welke, MJM (by and through Arrington, Kratville, and Welke), and EMHC (by and through Arrington, Kratville, and Welke) cheated or defrauded or attempted to cheat or defraud pool participants and prospective pool participants and willfully deceived or attempted to deceive pool participants and prospective pool participants by, among other things, knowingly (i) misappropriating pool participant funds; (ii) misrepresenting futures and forex trading activity that purportedly occurred on behalf of pool participants, as well as purported returns pool participants would and did receive by virtue of these futures and forex trades; (iii) making, causing to be made, and distributing reports and statements to pool participants or prospective pool participants that contained false futures and forex trading activity, false profits generated from such activity, and other misinformation; and (iv) making fraudulent misrepresentations about the risks of trading futures and forex—all in violation of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), for conduct occurring prior to June 18, 2008; Section 4b(a)(1)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C), for futures-related conduct occurring on or after

June 18, 2008; and Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C), for forex-related conduct occurring on or after June 18, 2008.

52.     The foregoing acts, misrepresentations, omissions, and failures of Arrington, Kratville, and Welke, occurred within the scope of their agency, employment, or office with EMHC and MJM; therefore, EMHC and NIC are liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

53.     Arrington, Kratville, and Welke controlled EMHC and MJM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, EMHC's and MJM's conduct alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for EMHC's and MJM's violations of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006).

54.     Arrington, Kratville, Welke, MJM (by and through Arrington, Kratville, and Welke), and EMHC (by and through Arrington, Kratville, and Welke) engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

55.     Each misappropriation, issuance of a false report, misrepresentation or omission of material fact, including but not limited to those specifically alleged herein is alleged as a separate and distinct violation of Section 4b(a)(2)(i)-(iii) of the Act, 7 U.S.C. § 6b(a)(2)(i)-(iii) (2006), for conduct occurring prior to June 18, 2008; Section 4b(a)(1)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C), for futures-related conduct occurring on or after June 18, 2008; and Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C), for forex-related conduct occurring on or after June 18, 2008.

## COUNT TWO—AGAINST ALL DEFENDANTS
## FRAUD BY COMMODITY POOL OPERATORS

### Violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), and Regulation 4.41, 17 C.F.R. § 4.41(2010)

56.     The allegations set forth in paragraphs 1 through 55 are re-alleged and

incorporated herein by reference.

57.     As defined in Regulation 1.3(cc) a CPO is

any person engaged in a business which is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery or commodity option on or subject to the rules of any contact market, but does not include such persons not within the intent of this definition as the Commission may specify by rule or regulation or by order.

58.     As defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) (2010), an AP of a

CPO is any natural person associated with a CPO

as a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged.

59.     Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), prohibits CPOs and APs of

CPOs from using the mails or any other means of interstate commerce to:

(A) employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or
(B) engage in any transaction, practice or course of business which operates as a fraud or deceit upon any client or participant or prospective participant.

60.     Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) & (2) (2010), provides that

no CPO or principal of a CPO may advertise in a manner that:

(1) Employs any device, scheme or artifice to defraud any participant or client or prospective participant or client

(2) Involves any transaction, practice or course of business which operates as a fraud or deceit upon any participant or client or any prospective participant or client.

61.     From at least August 2005 until at least July 2006, EMHC acted as a CPO by soliciting, accepting, or receiving funds from others while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in futures or commodity options.  During this same period, Arrington, Kratville, and Welke acted as APs of EMHC.

62.     From at least July 2006 until at least July 2008, MJM acted as a CPO by soliciting, accepting, or receiving funds from others and while engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, for the purpose of trading in futures and commodity options.  During this same period, Arrington, Kratville, and Welke acted as APs of MJM.

63.     EMHC, MJM, and their respective APs (*i.e.*, Arrington, Kratville, and Welke) employed a device, scheme or artifice to defraud pool participants and prospective pool participants or engaged in a transaction, practice, or course of business which operated as a fraud or deceit upon the Elite Entities and NIC pool participants and prospective Elite Entities and NIC pool participants in violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), by (i) misappropriating pool participant funds; (ii) misrepresenting pool trading activity (including futures, options, and forex activity) that purportedly occurred on behalf of pool participants, as well as purported returns pool participants would and did receive by virtue of the trading activity; (iii) making, causing to be made, and distributing reports and statements to pool participants or prospective pool participants that contained false futures, options, and forex trading activity, false profits generated from such activity, and other misinformation; and (iv)

making fraudulent misrepresentations about the risks of trading futures, options, and forex.  The material misrepresentations and omissions also constitute violations of Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) and (2) (2010), by defendants.

64.     The foregoing acts, misrepresentations, omissions, and failures of Arrington, Kratville, and Welke, occurred within the scope of their agency, employment, or office with EMHC and MJM; therefore, EMHC and NIC are liable for these acts pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

65.     Arrington, Kratville, and Welke controlled EMHC and MJM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, EMHC's and MJM's conduct alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for EMHC's and MJM's violations of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), and Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2010).

66.     Arrington, Kratville, Welke, MJM (by and through Arrington, Kratville, and Welke), and EMHC (by and through Arrington, Kratville, and Welke) engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

67.     Each misappropriation, issuance of false report, misrepresentation or omission of material fact, including but not limited to those specifically alleged herein is alleged as a separate and distinct violation of Section 4o(1) of the Act, 7 U.S.C. § 6o(1) (2006), and Regulation 4.41(a), 17 C.F.R. § 4.41(a) (2010).

**COUNT THREE—AGAINST MJM, ARRINGTON, KRATVILLE, AND WELKE
FRAUD IN CONNECTION WITH OPTIONS**

**Violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006),
and Regulation 33.10, 17 C.F.R. § 33.10 (2010)**

68.     The allegations set forth in paragraphs 1 through 67 are re-alleged and

incorporated herein by reference.

69.     Section 4c(b) states that:

No person shall offer to enter into, enter into or confirm the execution of, any
transaction involving any commodity regulated under this act which is of the
character of or is commonly known to the trade as an "option", "privilege",
"indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline
guaranty", contrary to any rule, regulation, or order of the Commission
prohibiting any transaction or allowing any such transaction under such terms and
conditions as the Commission shall prescribe.

70.     Regulation 33.10, 17 C.F.R. § 33.10, provides that it is:

Unlawful for any person directly or indirectly (a) to cheat or defraud or attempt to
heat or defraud any other person; (b) to make or cause to be made to any other
person any false report or statement thereof or cause to be entered for any person
any false record thereof; (c) to deceive or attempt to deceive any other person by
any means whatsoever in or in connection with an offer to enter into, the entry
into, the confirmation of the execution of, or the maintenance of, any commodity
option transaction.

71.     From at least December 2006 until at least July 2008, Arrington, Kratville, Welke,

and MJM (by and through Arrington, Kratville, and Welke) have cheated or defrauded or

attempted to cheat or defraud the NIC pool participants and prospective pool participants by

(i) misappropriating pool participant funds; (ii) failing to disclose options trading activity that

occurred on behalf of pool participants; (iii) misrepresenting purported returns pool participants

would and did receive by virtue of these options trades; (iv) making, causing to be made, and

distributing reports and statements to pool participants or prospective pool participants that

omitted options trading activity and that contained false profits and other misinformation; and

23

(iv) making fraudulent misrepresentations about the risks of trading options, and other misinformation, all in violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulation 33.10, 17 C.F.R. § 33.10 (2010).

72.     Arrington, Kratville, Welke, and MJM (by and through Arrington, Kratville, and Welke) engaged in the acts and practices described above knowingly or with reckless disregard for the truth.

73.     The foregoing acts, omissions, and failures of Arrington, Kratville, and Welke, as well as other MJM employees and agents, occurred within the scope of their agency, employment, or office with MJM; therefore, MJM is liable for these acts, omissions, and failures pursuant to Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2 (a)(1)(B) (2006), and Regulation 1.2, 17 C.F.R. § 1.2 (2010).

74.     Arrington, Kratville, and Welke controlled MJM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, MJM's conduct alleged in this count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for MJM's violations of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulation 33.10, 17 C.F.R. § 33.10 (2010).

75.     Each misappropriation, issuance of a false report or statement, misrepresentation, or omission of material fact, including but not limited to those specifically alleged herein, is alleged as a separate and distinct violation of Section 4c(b) of the Act, 7 U.S.C. § 6c(b) (2006), and Regulation 33.10, 17 C.F.R. § 33.10 (2010).

## COUNT FOUR—AGAINST EMHC AND MJM
## FAILURE TO REGISTER AS A COMMODITY POOL OPERATOR

### Violations of Sections 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006)

76.     The allegations set forth in paragraphs 1 through 75 are re-alleged and incorporated herein by reference.

77.     Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006) provides that it is unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with its business as a CPO.

78.     From at least August 2005 until at least July 2006, EMHC used the mails or instrumentalities of interstate commerce, in or in connection with its business as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

79.     From at least July 2006 until at least July 2008, MJM used the mails or instrumentalities of interstate commerce, in or in connection with its business as a CPO while failing to register as a CPO, in violation of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

80.     Arrington, Kratville, and Welke controlled EMHC and MJM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, EMHC's and MJM's conduct alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for EMHC's and MJM's violations of Section 4m(1) of the Act, 7 U.S.C. § 6m(1) (2006).

## COUNT FIVE—AGAINST ALL DEFENDANTS
## FAILURE TO REGISTER AS AN ASSOCIATED PERSON OF A
## COMMODITY POOL OPERATOR

### Violations of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006)

81.     The allegations set forth in paragraphs 1 through 80 are re-alleged and incorporated herein by reference.

82.     Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006) states that it is:

Unlawful for any person to be associated with a [CPO] as a partner, officer, employee, consultant or agent . . . in any capacity that involves (i) the solicitation of funds, securities or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission . . . as an associated person of such [CPO] . . . .  It shall be unlawful for a [CPO] to permit such a person to become or remain associated with the [CPO] in any such capacity if the [CPO] knew or should have known that such person was not so registered . . .

83.     Since at least August 2005, Arrington, Kratville, and Welke were associated with CPOs EMHC and MJM and were involved in the solicitation of funds for participation in the Elite Entity and NIC pools while failing to register as APs of the CPOs, in violation of Section 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

84.     EMHC and MJM permitted Arrington, Kratville, and Welke to become associated with EMHC and MJM and knew, or should have known, that Arrington, Kratville, and Welke were not registered as APs of EMHC or MJM, in violation of 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

85.     Arrington, Kratville, and Welke controlled EMHC and MJM, directly or indirectly, and did not act in good faith or knowingly induced, directly or indirectly, EMHC's and MJM's conduct alleged in this count.  Therefore, pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for EMHC's and MJM's violations of 4k(2) of the Act, 7 U.S.C. § 6k(2) (2006).

## COUNT SIX—AGAINST EMHC AND MJM
## FAILURE TO COMPLY WITH DISCLOSURE AND REPORTING REQUIREMENTS

### Violations of Regulation 4.21, 17 C.F.R. § 4.21 (2010)

86.     The allegations set forth in paragraphs 1 through 85 are re-alleged and incorporated by reference.

87.     Regulation 4.21, 17 C.F.R. § 4.21 (2010), provides that

each commodity pool operator registered or required to be registered under the
Act must deliver or cause to be delivered to a prospective participant in a pool
that it operates or intends to operate a Disclosure Document for the pool prepared
in accordance with §§4.24 and 4.25 by no later than the time it delivers to the
prospective participant a subscription agreement for the pool.

88.     EMHC and MJM failed to provide a pool disclosure document in the form

specified by Regulation 4.21, 17 C.F.R. § 4.21 (2010), to prospective pool participants.

89.     Each failure of EMHC and MJM to furnish required disclosure documents to

prospective pool participants and pool participants, including but not limited to, those

specifically alleged herein, is alleged as a separate and distinct violation of Regulation 4.21,

17 C.F.R. § 4.21 (2010).

90.     Arrington, Kratville, and Welke controlled EMHC and MJM, directly or

indirectly, and did not act in good faith or knowingly induced, directly or indirectly, EMHC's

and MJM's conduct alleged in this count.  Therefore, pursuant to Section 13(b) of the Act,

7 U.S.C. § 13c(b) (2006), Arrington, Kratville, and Welke are liable for EMHC's and MJM's

violations of Regulation 4.21, 17 C.F.R. § 4.21 (2010).

## VI.     RELIEF REQUESTED

WHEREFORE, the CFTC respectfully requests that the Court, as authorized by

Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), and pursuant to its own equitable powers, enter:

A.     An order finding that defendants violated Sections 4b(a)(2)(i)-(iii) (for conduct

occurring before June 18, 2008), 4o(1), 4c(b), 4m(1), and 4k(2) of the Act,

7 U.S.C. §§ 6b(a)(2)(i)-(iii), 6o(1), 6c(b), 6m(1) and 6k(2) (2006); Section 4b(a)(1)(A)-(C) of the

Act, as amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(1)(A)-(C) (for futures-related

conduct occurring on or after June 18, 2008), and Section 4b(a)(2)(A)-(C) of the Act, as

amended by the CRA, to be codified at 7 U.S.C. § 6b(a)(2)(A)-(C) (for forex-related conduct occurring on or after June 18, 2008); and Regulations 4.21, 4.41, and 33.10, 17 C.F.R. §§ 4.21, 4.41, and 33.10 (2010);

      B.     An order of permanent injunction prohibiting defendants, and any other person or entity associated with defendants, from engaging in conduct that violates any sections of the Act, as amended by the CRA and Dodd-Frank, and the Regulations that defendants allegedly violated in this Complaint;

      C.     An order of permanent injunction prohibiting defendants and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation, including any successor thereof, from, directly or indirectly,

1. trading on or subject to the rules of any registered entity (as that term is defined in Section 1a of the Act, 7 U.S.C. § 1a);

2. entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1)) (2010) (commodity options), and/or foreign currency (as described in Section 2(c)(2)(B) and 2(c)(2)(C)(i) of the Act, as amended by the CRA (forex contracts)), to be codified at 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i), for their own personal account or for any account in which they have a direct or indirect interest;

3. having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

4. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

5. soliciting, receiving, or accepting any funds from any person or entity for the purpose of purchasing or selling any futures, options on futures, commodity options, and/or forex contracts;

6. applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010);

28

7.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R § 3.1(a) (2010)), agent or any other officer or employee of any person registered, exempted from registration or required to be registered with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2010); and

8.      from engaging in any business activities related to commodity futures, options on commodity futures, commodity options, and/or forex contracts trading;

D.      Enter an order directing defendants, as well as any successors to any defendant, to disgorge, pursuant to such procedure as the Court may order, all benefits received from the acts or practices which constitute violations of the Act, as amended by the CRA, to be codified at 7 U.S.C. §§ 1 *et seq*., as described herein, and pre- and post-judgment interest thereon from the date of such violations;

E.      Enter an order directing the defendants, as well as any successors of defendants, to rescind, pursuant to such procedures as the Court may order, all contracts and agreements, whether implied or express, entered into between, with, or among defendants and any of the pool participants whose funds were received by defendants as a result of the acts and practices which constituted violations of the Act; the Act, as amended; and the Regulations, as described herein;

F.      Enter an order requiring defendants to make full restitution to every person or entity whose funds defendants received or caused another person or entity to receive, from the acts or practices that constitute violations of the Act; the Act, as amended; and the Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

G.      Enter an order requiring defendants to pay civil monetary penalties, to be assessed by the Court, in amounts of not more than the higher of: (1) triple the monetary gain to defendant for each violation of the Act; the Act, as amended; and the Regulations, or (2) a penalty of $130,000 for each violation committed;

H. Enter an order requiring defendants to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2) (2006); and

I. Enter an order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Respectfully submitted by,

/s/ Christopher A. Reed
Charles D. Marvine
Missouri Bar No. 44906
Christopher A. Reed
Missouri Bar No. 59025
Margaret P. Aisenbrey
Missouri Bar No. 59560
U.S. Commodity Futures Trading Commission
Division of Enforcement
Two Emanuel Cleaver II Blvd., Suite 300
Kansas City, MO  64112
816-960-7743 (Marvine)
816-960-7740 (Reed)
816-960-7749 (Aisenbrey)
816-960-7750 (fax)
cmarvine@cftc.gov
creed@cftc.gov
maisenbrey@cftc.gov

Attorneys for Plaintiff

Dated:  May 23, 2011