## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>             **Plaintiff,**<br><br>    **vs.**<br><br>**JONATHAN W. ARRINGTON, ELITE MANAGEMENT HOLDINGS CORP., MJM ENTERPRISES LLC, MICHAEL B. KRATVILLE, and MICHAEL J. WELKE,**<br><br>             **Defendants.** | **CASE NO. 8:11CV181**<br><br>**MEMORANDUM AND ORDER ON DEFAULT JUDGMENT** |

This matter is before the Court on the Motion for Default Judgment against Jonathan Arrington ("Arrington"), Elite Management Holdings Corp. ("EMHC"), and MJM Enterprises LLC ("MJM") (Filing No. 109), filed by the Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC"). For the reasons stated below, the CFTC's Motion for Default Judgment will be granted.

## FACTUAL BACKGROUND AND FINDINGS

For the purposes of CFTC's Motion for Default Judgment, the Court incorporates by reference the well-pled facts alleged in the Complaint, which Arrington, EMHC, and MJM have never contested by answer or other responsive pleading. These facts are taken as true. Fed. R. Civ. P. 8(d).

## I.      Parties

CFTC is an independent federal regulatory agency that is charged by Congress with the administration and enforcement of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (the "Act") and the Regulations promulgated thereunder, 17 C.F.R. §§ 1.1 *et*

*seq.* EMHC was a Nebraska corporation formed on August 16, 2005, with its principal place of business in Omaha, Nebraska. Arrington, and Defendants Michael B. Kratville ("Kratville") and Michael J. Welke ("Welke") owned and controlled EMHC, purportedly "established to provide conservative investors with an opportunity to invest a small portion of their investment portfolios in an aggressively managed investment account with the potential for higher overall yields." (Filing No. 1.) EMHC engaged in a business that was of the nature of an investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodities for future delivery or commodity options. EMHC acted as the controlling and general partner for, at a minimum, the following investment pools: Elite Aggressive Growth Group LP ("EAGG"); Elite Management Investment Fund LP ("EMIF"), and Elite Index Investment Group LP ("EIIG"). EMHC was never registered with the CFTC.

MJM was a Wyoming limited liability company formed on May 25, 2006, with a principal place of business in Omaha, Nebraska. Arrington, Kratville, and Welke owned and controlled MJM, which engaged in a business in the nature of an investment trust, syndicate, or similar form of enterprise, and, in connection therewith, solicited, accepted, or received from others, funds, securities, or property for the purpose of trading in commodities for future delivery or commodity options. MJM acted as the controlling and general partner for the NIC LLC ("NIC") investment pool. MJM was never registered with the CFTC.

Arrington, a resident of Omaha, Nebraska, was an equal owner and president of EMHC and president/managing partner of MJM. He jointly operated or controlled

2

(directly or indirectly) EMHC and MJM, with Welke and Kratville.  Arrington also was a self-identified trader for the various pools used by the Defendants.  In association with both EMHC and MJM, Arrington served as a partner, officer, employee, consultant, or agent in a capacity that involved the solicitation of funds for participation in pools operated by EMHC and MJM.  Arrington never registered with the CFTC.

## II.    Origin of Investment Pools

As detailed in the CFTC's Complaint, in or around the late summer of 2005, Arrington, Kratville, and Welke met at Kratville's house and decided to form multiple investment pools that they would use to solicit money from others and invest with FX Investment Group (FXIG), that purportedly traded in futures and spot markets for commodities, precious metals, and foreign currency.  To carry out their scheme, EMHC, an unregistered commodity pool operator (CPO), and Arrington, Kratville, and Welke, unregistered associated persons (APs) of EMHC, initially used three pools—EAGG, EIIG, and EMIF (collectively, Elite Pools), which were portrayed as investment clubs, formed as limited partnerships, in which pool participants supposedly would become partners.

EMHC was the general partner of the Elite Pools.  Through their ownership of EMHC, Arrington, Kratville, and Welke exerted total control over the Elite Pools.  For example:

    a.    all three agreed that the Elite Pools' funds would be traded by FXIG;

    b.    all three were signatories on the bank accounts for the Elite Pools; and

    c.    all three actively solicited individuals to become pool participants of the Elite Pools.

3

Arrington, Kratville, and Welke also represented to pool participants and prospective pool participants that the three of them controlled the Elite Pools.

## III.   Solicitations for the Elite Pools

In or around late summer of 2005, Arrington, Kratville, and Welke began soliciting prospective pool participants to trade in futures and foreign exchange markets ("forex") through the Elite Pools.  When soliciting prospective pool participants, EMHC—by and through Arrington, Kratville, and Welke—touted, among other things, their own extensive and successful experience trading futures and forex, the superior methodology of their program, the long and successful track record of their program, and their ability to limit risk while delivering above average returns.  Pool participants received a brochure that described the pools' trading strategy, represented that there had been several multimillion offers for purchase of the investment system, and stated that the purpose was to help small investors earn money.

The Defendants' solicitations included discussions of the Elite Pools' return structure.  Pool participant returns purportedly were to be capped based on the amount of funds a participant invested with the Elite Pools.  For example, one prospective pool participant was told that if she invested between $10,000 and $25,000, her returns would be capped at 4% monthly, if she invested between $25,000 and $50,000, her returns would be capped at 5% monthly, and if she invested more than $50,000, her returns would be capped at 6% monthly.  The percentage caps also were referred to as the "return goals" or the "target returns."  Though representations about the required investment and rates of return varied, the Defendants' solicitations included a representation that the Elite Pools met target returns every month for several years.

4

EMHC, Arrington, Kratville, and Welke did not have extensive, successful experience trading futures or forex; they did not own a program with a long successful track record or one that could greatly limit trading risks; and they had received no offers to buy their proprietary trading program. The Elite Pools had not made their target return goals each and every month for several years, as claimed by the Defendants; instead (1) trading had occurred by or on behalf of the Elite Pools for only a few months; (2) the earliest Elite Pool was not formed until February of 2004; and (3) the earliest Elite Pool participant was solicited in or around the late summer of 2005. EMHC, Arrington, Kratville, and Welke knew their representations were false.

EMHC—by and through Arrington, Kratville, and Welke—told pool participants and prospective pool participants that EMHC (and Arrington, Kratville, and Welke via their ownership of EMHC) would not be compensated unless pool participants received their target returns. The Defendants' compensation purportedly was to be composed of the returns in excess of target returns (*i.e.*, if the purported monthly return was 10%, then Defendants' compensation would be the difference between 10% and the stated target return).

EMHC—by and through Arrington, Kratville, and Welke—also told pool participants and prospective pool participants that any expenses incurred by or for the Elite Pools would be paid by EMHC, rather than out of the pooled funds or the pool participants' share of the returns. Despite these promises, Arrington, Kratville, and Welke used pooled participant funds to operate the pool and to pay for personal expenses, such as trips to Europe for Arrington and Welke. EMHC—by and through Arrington, Kratville, and Welke—told pool participants and prospective pool participants

there was little risk in investing with the Elite Pools because only 5-10% of their funds would be invested at any one time.  Each of these statements was false.

In addition to the above, EMHC—by and through Arrington, Kratville, and Welke—made other misrepresentations to pool participants and prospective pool participants:

- Arrington told prospective pool participants and pool participants that the Elite Pools met the maximum target return of 6% for at least 42 consecutive months as of the fall 2005.  He claimed the year-to-date returns, with compounding, in 2005 were 53.9% for customers at the 4% per month target-return level, 71.0% at the 5% per month target-return level, and 89.8% at the 6% per month target-return level.  These statements were false.

- Some prospective pool participants and pool participants were referred to Welke by Arrington and Kratville.  On those occasions, Welke acted as a reference for the Elite Pools, but did not disclose his interest and role with EMHC and the Elite Pools.  Rather, he posed as a like-minded pool participant with money invested in the Elite Pools.  He falsely purported to provide an impartial reference vouching for Arrington's character.

- Kratville told at least one prospective pool participant that he spent ten years developing and testing the trading program that the Elite Pools used and that the program had been making the target returns between 4% and 5% per month and 60% annually for the past forty months as of April 2006.  Kratville also said that several companies offered to buy the program, but Kratville refused to sell it because the program was making so much money that there was no need to sell it.  Kratville also told the prospective pool participant that Kratville was a friend of Warren Buffett and that Buffett's children invested with Elite Pools.  These statements were false.  After the then-prospective pool participant decided to invest, Kratville referred him to Arrington to open the account.

EMHC—by and through Arrington, Kratville, and Welke—provided prospective pool participants and pool participants with written marketing materials describing the Elite Pools.  These materials made several of the same misrepresentations described above, about the purported performance of the Elite Pools, target-return tiers, and purported excellent risk-versus-return.

6

IV.     **Elite Pools Participant Statements**

EMHC—by and through Arrington, Kratville, and Welke—emailed pool participants a monthly newsletter that discussed the Elite Pools' previous month's trading results, and year-to-date returns, and represented that the target returns had been achieved for a certain number of consecutive months.  For example, on November 7, 2005, Welke emailed an October 2005 newsletter to a pool participant, stating that the Elite Pools hit the "maximum target goal of 6% for the 42nd consecutive month" and that the year-to-date returns at the three target return levels were 53.9% at the 4% target, 62.9% at the 5% target, and 79.1% at the 6% target.  Each of these statements was inaccurate.

Pool participants logged onto their individual accounts on the Elite Pools' website (www.emholdings.com) to view their account statements, and at least one pool participant received his account statements by mail.  The account statements purported to show pool participants' investments growing by the percentage return goal, compounded every month.  The online and mailed statements viewed by several of the pool participants showed purported gains every month from October 2005 through May 2006, ranging from 2% to 6%.  Each of these statements was false.

V.      **EMHC and the Elite Pools Become MJM and NIC**

On May 12, 2006, the State of Nebraska Department of Banking and Finance ("NDBF") sent EMHC a letter notifying EMHC that the sale of limited partnership investments implicated state law.  NDBF sought information from EMHC, including, among other things, the names and addresses of all officers of EMHC, including EMHC's executive trader and trading group.  In the letter, NDBF also stated that EMHC

7

was prohibited from selling interests in the investment pool until the matter was resolved.

In a May 26, 2006, response letter to NDBF, Kratville, as the attorney for and an owner of EMHC, made several representations, including that: (1) Arrington, Kratville, and Welke were the trading group; (2) Arrington was the senior or executive trader because of his past experience with investment clubs; and (3) Kratville and Welke "have extensive trading experience...."  Kratville also represented that he, Arrington, and Welke were the sole officers of EMHC.  In the letter, EMHC agreed not to make any further offers or sales of investments in the Elite Pools.  Kratville and Welke, acting on behalf of EMHC and the Elite Pools, also met with NDBF and reiterated those representations.  NDBF demanded that the Elite Pools shut down because the Elite Pools were not operated in accordance with state law.

At about the same time that Arrington, Kratville, and Welke purported to shut down EMHC and the Elite Pools, they started a new group of entities—NIC LLC (NIC) and MJM—to continue their fraudulent scheme.  Like the Elite Pools and EMHC, NIC was an investment pool, in which pool participants invested, and MJM was the controlling member that managed NIC.  Arrington, Kratville, and Welke equally owned MJM.  Through their ownership of MJM, Arrington, Kratville, and Welke exerted control over NIC.

Arrington, Kratville, and Welke did not tell NDBF about NIC and MJM, and led NDBF to believe they were following its directive.  While setting up NIC and MJM, and to demonstrate that the Elite Pools were shutting down, Arrington, Kratville, and Welke asked each pool participant for a notarized signature acknowledging that the Elite Pools

8

had returned that pool participant's funds. Arrington, Welke, and Kratville persuaded the Elite Pools' participants to sign the documents, but did not disclose why NDBF sought to shut down the Elite Pools.  On the same day that Arrington, Kratville, and Welke sent the letter seeking a notarized signature from each Elite Pools participants, the three sent a second letter to the participants, providing a purportedly accurate rollover balance and cautioning the investors not to provide the information to anyone else.

In August and September 2006, EMHC—by and through Kratville—forwarded to NDBF the notarized documents with the Elite Pools participants' acknowledgment that their funds had been returned.  EMHC—by and through Kratville—also informed NDBF that Arrington, Kratville, and Welke decided to dissolve EMHC and the Elite Pools. Arrington, Kratville, and Welke did not disclose to NDBF that they had started MJM, an unregistered CPO (for which they were unregistered APs), and NIC, nor did they disclose that the Elite Pools members' accounts had been rolled over to NIC.

## VI.    NIC and MJM Solicitation of Customers

From July 2006 until at least September 2007, MJM—by and through Arrington, Kratville, and Welke—made substantially similar representations to prospective pool participants and pool participants of NIC (as they had done to prospective pool participants and pool participants of the Elite Pools), including representations that pool participants' funds would be traded in futures and forex; that investment pools they controlled had been extremely profitable and had met or exceeded target returns for several years; and that no more than 10% of a pool participant's money would be at risk at any one time.   MJM, Arrington, Kratville, and Welke each knew that these

representations were false.  Further, MJM—by and through Arrington—represented the following to certain pool participants regarding NIC's trading:

- that Arrington was NIC's trader and that he developed the trading program that NIC used;

- that he tested the program for over a year using his father's money to trade;

- that he was offered several million dollars to sell the program, but he refused because he could make more money using it himself; and

- that the program had never lost money.

Each of these representations was false.

MJM—by and through Arrington—also represented the following to certain pool participants:

- that Arrington used to do all the trading himself, but became too busy handling other aspects of the business;

- that NIC employed traders, who traded 24 hours a day, seven days a week;

- that, in the beginning, NIC employed six of the top ten traders in the world, and, as of March 2007, NIC employed nine of the top ten.

Each of these statements was false.

## VII.   MJM and NIC Customer Statements

Many NIC pool participants accessed their account statements through the NIC website (www.nicllc.org) and at least one pool participant received statements via mail. The statements included, among other things, the principal contributed by the pool participants, the purported monthly returns expressed as both a percentage and dollar amount, and the ending balances.  The statements provided to several NIC pool participants showed gains every month from January 2006 through June 2007 ranging

10

from 3.01% to 4.5%.  The monthly returns as expressed in dollars and month-end balances also reflected the purported gains.  These statements were all inaccurate.

Beginning in November 2006 and continuing through August 2007, Defendants traded forex and options with newly acquired NIC pool participant funds.  MJM, Arrington, Kratville, and Welke never told pool participants that their funds would be used to trade options.  Contrary to the statements provided to pool participants, there were many months in which trading on behalf of NIC resulted in significant losses.

Statements provided to NIC pool participants who were former Elite Pools participants were false.  The account balances and returns on the NIC statements did not reflect that the trading on behalf of the Elite Pools ultimately resulted in a total loss; instead, the NIC statements to former Elite Pools participants purported to show principal (that, in fact, had already been lost) and consistent gains (that did not exist).

By July 2007, NIC's forex and options trading resulted in a total loss.  MJM—by and through Arrington—informed NIC pool participants of this total loss beginning in or about October 2007.  However, MJM—by and through Arrington—continued to falsely represent, as late as July 2008, the timing of the pool participants' losses.

Defendants lost almost $3 million (including fees and commissions) trading futures, forex, and options on forex with the Elite Pools and NIC participants' funds.  Defendants misappropriated more than $1.5 million in pool participant funds to pay for the Defendants' golf club memberships, travel, dining, and other personal expenses of Defendants and their family members.  Defendants used approximately $850,000 in pool participant funds to make Ponzi payments to certain pool participants.

**VIII.  Total Customer Deposits and Defendants' Misappropriation**

From July 7, 2005 through December 31, 2008, Defendants received more than $4.6 million from customers for the Elite and MJM Pools.  Defendants paid out approximately $842,000 in "returns" or "refunds" to their customers, and lost a net amount of approximately $2,967,000 trading.  Defendants misappropriated the remainder of the customer funds in their possession, estimated at $827,346.63.  In total, pool participants lost $3,833,982.02.

## DEFAULT JUDGMENT STANDARD

When a party against whom a default judgment is sought has failed to plead or otherwise assert a defense, and that fact has been documented, the clerk shall enter the party's default.  Fed. R. Civ. P. 55(a).  The party seeking the default must then apply to the court for a default judgment.  Fed. R. Civ. P. 55(b).  "It is a familiar practice and an exercise of judicial power for a court upon default, by taking evidence when necessary or by computation from facts of record, to fix the amount which the plaintiff is lawfully entitled to recover and to give judgment accordingly."  *Pope v. United States*, 323 U.S. 1, 12 (1944).

Here, Arrington, EMHC, and MJM failed to respond to the Complaint after notice; they have not attempted to dispute or defend against the allegations in the Complaint; and they have not otherwise appeared in this action.  The Clerk of the Court has entered defaults against Arrington, EMHC, and MJM.  (Filing No. 17.)  Accordingly, under Federal Rule of Civil Procedure 55(b)(2) and for the reasons stated below, the CFTC's allegations in the Complaint against Arrington, EMHC, and MJM are accepted as true, and a default judgment will be entered against Arrington, EMHC, and MJM.

**DISCUSSION**

**I.    Violations of the Act and Regulations**

The Act authorizes the CFTC to seek injunctive relief against any person whenever it shall appear to the CFTC that such person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of the Act or any rule, regulation, or order thereunder.  7 U.S.C. § 13a-1(a).  Venue properly lies with the Court pursuant to Section 6c(e) of the Act because certain transactions, acts, practices, and courses of business alleged in this Complaint occurred within this District.  *Id.*

A principal purpose of the Act is "protecting the innocent individual investor–who may know little about the intricacies and complexities of the commodities market–from being misled or deceived."  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1329 (11th Cir. 2002).  "[C]aveat emptor has no place in the realm of federal commodities fraud. Congress, the CFTC, and the Judiciary have determined that customers must be zealously protected from deceptive statements by brokers who deal in these highly complex and inherently risky financial instruments."  *Id.* at 1334.  The CFTC alleges that Arrington, EMHC, and MJM violated the Section 4b(a)(2)(i)-(iii) of the Act[1] by committing fraud in connection with futures and forex.[2]

**A.    Arrington, EMHC, and MJM Misappropriated Pool Participant Funds**

Arrington, EMHC, and MJM violated 7 U.S.C. § 6b (a)(2)(i) and (iii) (2006) (for conduct prior to June 18, 2008), and 7 U.S.C. § 6b(a)(2)(A) and (C) (2012) (for conduct

---

[1] The CFTC's claims arise under 7 U.S.C. § 6b(a)(2)(i)-(iii) of the Act for conduct prior to June 18, 2008, and 7 U.S.C. § 6b(a)(1) and § 6b(a)(2)(A)-(C) of the CEA (for conduct on or after June 18, 2008)

[2] The CFTC has jurisdiction over the forex transactions at issue pursuant to 7 U.S.C. § 2(c)(2).

on or after June 18, 2008), by misappropriating pool participant funds.  The Complaint shows that Arrington, EMHC, and MJM spent pool participant funds on, among other things, trips to Europe, country club memberships, dining at restaurants, and EMHC's and MJM's operating expenses.  *See CFTC v. Skorupskas*, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant misappropriated customer funds entrusted to her by soliciting investor funds for trading and then trading only a small percentage of those funds, while disbursing the rest of the funds to other investors, herself, and her family). Arrington, EMHC, and MJM's misuse of pool funds violated the Act.

**B.    Defendants' Misrepresentations, Omissions, and False Statements Violated the Act**

Arrington, EMHC, and MJM violated 7 U.S.C. § 6b (a)(2)(i)-(iii) (2006) (for conduct prior to June 18, 2008), and 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) (for conduct on or after June 18, 2008), through their misrepresentations, omissions, and false statements to pool participants.  To establish liability for fraud based on this conduct, the CFTC must prove that (1) a misrepresentation, misleading statement, or omission was made; (2) with scienter; and (3) that the misrepresentation was material.  *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328-29 (11th Cir. 2002); *Dudley v. Dittmer*, 795 F.2d 669, 672-73 (8th Cir. 1986).

**1.    Arrington, EMHC, and MJM Made Misrepresentations and Omissions to Pool Participants and Sent False Statements to Pool Participants**

The Complaint and evidence before the Court demonstrate that Arrington, EMHC, and MJM (1) falsely touted to pool participants that they had extensive and successful experience trading futures and forex; (2) falsely claimed to have generated

trading returns of at least 3% or more from at least May 2002 through at least June 2007—a period of time that preceded the earliest date that any of the pools existed; and (3) falsely claimed that only a small portion of the pool participants' funds (between 5% and 10%) would be at risk at any one time.  *See*, *e.g.*, *CFTC v. Vartuli*, 228 F.3d 94, 100-02 (2d Cir. 2000) (holding that misrepresentations about risk and past performance made in connection with futures trading violated Section 4b). Arrington, EMHC, and MJM also violated the Act by sending pool participants false written reports and statements. For example, Arrington, EMHC, and MJM provided information to pool participants via websites and sent emails that contained false account balances and false trading returns.  *See Skorupskas*, 605 F. Supp. at 932-33 (holding that defendant violated Section 4b(a) of the Act by issuing false monthly statements to customers). Accordingly,  Arrington, EMHC, and MJM made misrepresentations in violation of the Act.

### 2.    Arrington, EMHC, and MJM Acted with Scienter

"Scienter" is "the intent to deceive, manipulate, or defraud."  *Florida State Bd. of Admin. v. Green Tree Financial Corp.*, 270 F.3d 645, 653 (8th Cir. 2001) (citations omitted).  Scienter may be established by facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud," by facts showing "severe recklessness," or with specific allegations of motive and opportunity.  *In re: K–Tel Intl, Inc. Sec. Litig.*, 300 F.3d 881, 893-94 (8th Cir. 2002).  To show the appropriate intent, it is not important that the defendant "may not have had an evil motive or an affirmative intent to injure his customer, or that he did not subjectively want to cheat or defraud [a customer].  It is enough that he acted deliberately . . . ."  *CFTC v. Morse*, 762 F.2d 60,

62 (8th Cir. 1985) (quoting *Haltmier v. CFTC*, 554 F.2d 556 (2d Cir.1977).  The Eighth

Circuit defines severe recklessness as:

> highly unreasonable omissions or misrepresentations that involve not
> merely simple or even inexcusable negligence, but an extreme departure
> from the standards of ordinary care, and that present a danger of
> misleading buyers or sellers which is either known to the defendant or is
> so obvious that the defendant must have been aware of it.

*Green Tree Financial*, 270 F.3d at 654.

Arrington, EMHC, and MJM made, in connection with futures and forex

transactions, misrepresentations or omissions of fact and sent false statements to pool

participants with the requisite scienter.  Arrington, EMHC, and MJM knew that their

representations and reports regarding the alleged pool were false.  For example,

Arrington, EMHC, and MJM knew (1) when soliciting pool participants that the pools did

not have a history of generating 3% or more returns from at least May 2002 through at

least June 2007—a period of time that preceded the earliest date that any of the pools

existed; (2) Arrington, Kratville, and Welke did not have extensive futures and forex

trading experience or a successful trading track record as represented in Arrington's,

EMHC's, and MJM's solicitations; (3) that more than 5% to 10% of the pool participants'

funds were at risk at any given time; (4) the trading returns and account balances they

reported were false; and (5) they were misappropriating pool participant funds.

### 3.  Defendants' Misrepresentations, Omissions, and False Statements Were Material.

The misrepresentations, false statements and omissions made by Arrington,

EMHC, and MJM were material.   "A representation or omission is 'material' if a

reasonable investor would consider it important in deciding whether to make an

16

investment." *R.J. Fitzgerald*, 310 F.3d at 1328-29.  Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is material.  *Capitalstreet Financial, LLC,* No. 3:09–cv–387, 2012 WL 79758, at *7 (citing *In re Commodities Int'l Corp.*, [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,943, 1997 CFTC LEXIS 8, at *25 (CFTC Jan. 14, 1997)).   "[M]aterial misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for would be sufficient to state a cause of action pursuant to the [Act]."  *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 110 (2d Cir.1986) (internal marks omitted).

Defendants' representations about the trading track record for the pools run by EMHC and MJM, their profits, and the purported limited risk, were all material, and the Defendants' omissions about the misappropriation of pool participants' funds were material.  *See R.J. Fitzgerald*, 310 F.3d at 1330 (representations about profit potential and risk are material); *see also CFTC v. Fleury*, No. 03–61199 CIV.2010 WL 5146283, at *16 (S.D. Fla. June 18, 2010) ("Misrepresentation concerning the profitability of commodity trading methodologies are material and fraudulent.   Statements and omissions that minimize the risk of loss inherent in trading futures contracts are also material and fraudulent.") (citations omitted).

CFTC has demonstrated that Arrington, EMHC, and MJM violated 7 U.S.C. § 6b (a)(2)(i)-(iii) (2006) (for conduct prior to June 18, 2008), and 7 U.S.C. § 6b(a)(2)(A)-(C) (2012) (for conduct on or after June 18, 2008).

## II.     Fraud by a Commodity Pool Operator

### A.     EMHC and MJM were Commodity Pool Operators ("CPOs")

A CPO is defined as:

> [A]ny person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in any commodity for future delivery or commodity option on or subject to the rules of any contract market . . . .

Regulation 1.3(cc), 17 C.F.R. § 1.3.

EMHC and MJM pooled participants' funds for at least four different commodity investment pools, purported to trade the pooled funds in futures and commodity options, and told participants that their individual returns equaled the pool's return. Accordingly, EMHC and MJM were CPOs under the Act.

### B.    Arrington was an AP of a CPO

Arrington was an associated person ("AP") under the Act. As defined by Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3), an AP of a CPO is any natural person associated with a CPO as "a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged." Arrington was an officer and agent of EMHC and MJM and solicited funds on behalf of both EMHC and MJM. Accordingly, Arrington was an AP of a CPO under the Act.

### C.    Fraudulent Transactions

The Act broadly prohibits fraudulent transactions by a CPO, and an AP of a CPO. 7 U.S.C. § 6o(1).    The same conduct that violates 7 U.S.C.§ 6b also violates 7 U.S.C. § 6o(1)(A).   *See, e.g.*, *CFTC v. Driver*, 877 F.Supp.2d 968, 979 (C.D. Cal.

18

2012); *Skorupskas*, 605 F.Supp. at 932. "The primary difference is that unlike Sections 4b and 4o(1)(A) of the Act, Section 4o(1)(B) has no scienter requirement." *Driver*, 877 F.Supp.2d at 979 (citations omitted); *see also Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). The language in Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) & (2) (2013), is substantially the same as that contained in 7 U.S.C. § 6o(1). Accordingly, Defendants Arrington, EMHC, and MJM fraudulently misappropriated funds, made misrepresentations, and issued false statements in violation of 7 U.S.C. § 6o and 17 C.F.R. § 4.41(a).

## III.   Fraud in Connection with Options

The Act prohibits any person from violating "any rule, regulation, or order of the Commission" when offering or entering into option contracts on commodities regulated under the Act. 7 U.S.C. § 6c(b), 17 C.F.R. § 33.10 (repealed 2012). Regulation 33.10 made it:

> [u]nlawful for any person directly or indirectly (a) to cheat or defraud or attempt to cheat or defraud any other person; (b) to make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof; (c) to deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

The requirements of Regulation 33.10 placed responsibilities on Arrington, EMHC, and MJM identical to those found in 7 U.S.C. § 6b, and their violations discussed above also constitute violations of 7 U.S.C. § 6c(b), 17 C.F.R. § 33.10. *CFTC v. Aurifex Commodities Research Co.*, 1:06–CV–166, 2008 WL 299002, at *5 n.4 (W. D. Mich. Feb. 1, 2008); *see also RJ Fitzgerald* 310 F.3d at 1328. Accordingly, Arrington, EMHC, and MJM committed fraud in connection with options.

**IV.     Failing to Register as Commodity Pool Operators**

The Act makes it unlawful for any CPO, unless registered under the Act, to make use of the mails or any means or instrumentality of interstate commerce in connection with its CPO business. 7 U.S.C. § 6m(1).   EMHC and MJM, acting as unregistered CPOs, solicited prospective pool participants and pool participants via email; received and sent pool participant funds through wire transfers and other comparable electronic transfers; and provided false reports to pool participants via email and mail. Accordingly, EMHC and MJM, violated 7 U.S.C. § 6m(1), because EMHC and MJM used mail and other means of interstate commerce in connection with their pools, while failing to register as a CPO.

**V.     Failure to Register as an Associated Person of a Commodity Pool Operator**

The Act prohibits any person to be associated with a CPO as a partner, officer, or agent in any capacity that involves the solicitation of funds for participation in a commodity pool, unless that person is registered as an associated person. 7 U.S.C. § 6k(2).   Section 6k(2) also makes it unlawful for a CPO to permit such a person to be associated with the CPO if the CPO knew or should have known that person was not registered.   Since at least as early as August 2005, Arrington was associated with CPOs EMHC and MJM, and was involved in the solicitation of funds for participation in the Elite Pools and NIC Pool while failing to register as an AP of the CPOs.   Further, the evidence demonstrates that Arrington, Kratville, and Welke were the sole owners and officers of EMHC and MJM, and were unregistered.   Thus, Arrington was engaged in the solicitation of funds while unregistered in violation of 7 U.S.C. § 6k(2).

20

## VI.     Failing to Deliver Required Pool Disclosure Document

Regulation 4.21 provides that "each commodity pool operator registered or required to be registered under the Act must deliver or cause to be delivered to a prospective participant in a pool that it operates or intends to operate a Disclosure Document for the pool prepared in accordance with [Commission Regulations] §§ 4.24 and 4.25[, 17 C.F.R. §§ 4.24 & 4.25,] by no later than the time it delivers to the prospective participant a subscription agreement for the pool."[3] 17 C.F.R. § 4.21.  Here, none of the solicitation documents, or any other document that EMHC or MJM provided to pool participants, contained sufficient or appropriate information to comport with Regulation 4.21.  Accordingly, EMHC and MJM violated Regulation 4.21.

## VII.    Arrington Is Liable Under the Act for EMHC's and MJM's Violations of the Act and Regulations

As a controlling person of EMHC and MJM, Arrington is liable for EMHC's and MJM's violations pursuant to 7 U.S.C. § 13c(b).  Section 13(b) provides for liability for a person "who, directly or indirectly controls any person who has violated any provision of this Act [or the regulations] . . . to the same extent as such controlled person" provided the CFTC proves that the "controlling person did not act in good faith or knowingly induced, directly or indirectly, the acts constituting the violation."  "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself."  *JCC, Inc. v.*

---

[3] Commission Regulations 4.24, 4.25, and 4.26 specify the required information for a pool disclosure statement and mandate that it must be filed with the CFTC.  Among other things, pool disclosure statements must contain specific cautionary and risk disclosure statements.

*CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995) (quoting *In re Apache Trading Corp.*, Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 38,794 (CFTC Mar. 11, 1992) (citation omitted); *see also Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (noting same purpose while interpreting similar control person liability statute under Securities Exchange Act).

One is a controlling person when he or she has "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *In re Spiegel*, Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,765 n.4 (CFTC Jan. 12, 1988); *see also Behrens*, 619 F.3d at 873 (interpreting similar control person liability statute under Securities Exchange Act, and stating that the control person statute is to be interpreted liberally "as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable"). It is the person's "power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993); *see also Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985) (rejecting the "culpable participation" requirement for control person in the securities law context). A controlling person "knowingly induced" the conduct if he or she "had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." *RJ Fitzgerald*, 310 F.3d at 1334.

To establish the "knowing inducement" element of the controlling person violation, the CFTC must show that the "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *JCC, Inc.*, 63 F.3d at 1568. Controlling persons cannot

22

avoid liability by deliberately or recklessly avoiding knowledge about potential wrongdoing. *See In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). Constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc.*, 63 F.3d at 1568. To support a finding of constructive knowledge, the CFTC must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *Id.* at 1569 (citations omitted).

Arrington is liable under 7 U.S.C. § 13c(b) with respect to EMHC's and MJM's violations. Arrington was an owner and officer of EMHC and MJM. He jointly operated EMHC and MJM. He jointly selected traders and financial institutions used by EMHC and MJM. He solicited pool participants, held meetings with pool participants, and represented to various pool participants and prospective pool participants that he was an owner and officer of EMHC and MJM. Arrington claimed, to at least some pool participants, that he was responsible for developing the highly successful trading program the pools' purportedly followed. Given Arrington's control of EMHC and MJM, as well as his lack of good faith, Arrington is liable for EMHC's and MJM's violations of the Act and Regulations.

## VIII.   EMHC and MJM Are Liable Under the Act and Regulation 1.2 for the Violations Committed by their Agents

Arrington and other agents, including Kratville, of EMHC and MJM committed the acts, omissions, and failures described herein within the course and scope of their employment at EMHC and MJM. EMHC and MJM, therefore, are liable under 7 U.S.C.

§ 2(a)(1)(B), and 17 C.F.R. § 1.2, as principals for their agents' acts constituting violations of the Act and Regulations.

## IX.    Remedies for Default

### A.    Permanent Injunction

The Act empowers the CFTC to seek permanent injunctive relief and states in pertinent part:

> Whenever it shall appear to the [CFTC] that any registered entity or other person has engaged in, is engaging in, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order, thereunder . . . the [CFTC] may bring an action in the proper district court of the United States, . . . to enjoin such action or practice, or to enforce compliance with this Act, or any rule, regulation or order thereunder….

7 U.S.C. § 13a-1(a).

In granting an injunction, "the ultimate test ... is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir.1980)). In evaluating whether to grant an injunction, the Court may consider the following factors:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.; see also SEC v. Cohen*, 2007 WL 1192438, at *19 (E.D. Mo. 2007). These factors favor granting the requested injunction against Defendants Arrington, EMHC, and MJM.

The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown. For example, upon the CFTC's showing of a violation, courts have

24

entered permanent injunctions against future violations of the Act.  *See, e.g., CFTC v. U.S. Metals Depository Co.,* 468 F. Supp. 1149 (S.D.N.Y. 1979).  Broader injunctions prohibiting trading activity, in addition to enjoining defendants from future violations, may also be warranted.  *See, e.g., Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1346 (upholding the district court's permanent injunction prohibiting the defendants from "engaging in any commodity-related activity").  Here, permanent injunctive relief, including a comprehensive trading ban, is warranted against Arrington, EMHC, and MJM, and this Court will enter such a permanent injunction restraining them and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from violating the Act and from future trading.

## B.    Monetary Relief

The unqualified grant of statutory authority to issue an injunction under the Act carries with it the full range of equitable remedies, among which is the power to grant restitution.  *CFTC v. Commercial Hedge Services, Inc.*, 422 F.Supp.2d 1057, 1060 (D. Neb. 2006).  In addition, 7 U.S.C. § 13a-1(d), authorizes the imposition of civil monetary penalties.  The CFTC seeks both forms of monetary relief in this case.

### 1.    Restitution

The Court will order Arrington, EMHC, and MJM to pay, jointly and severally,[4] restitution in the amount of $3,833,982.02, plus post-judgment interest.  Post-judgment interest on Arrington's, EMHC's, and MJM's restitution obligations will accrue beginning

---

[4] In addition to being directly liable for this restitution obligation, Arrington, as a control person of both EMHC and MJM, is jointly and severally liable for their restitution obligations.  *See* Section 13(b) of the Act, 7 U .S.C. § 13c(b).

on the date of entry of this Order and will be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).[5] The Court has already appointed the National Futures Association as Monitor in this case. (Filing No. 85.)  The Monitor will collect restitution payments from Arrington, EMHC, and MJM and will make distributions as set forth in the order section below.

### 2.  Civil Monetary Penalty

The Act provides that "the [CFTC] may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the Act or Regulations] a civil penalty."  7 U.S.C. § 13a-1(d).  Under § 13a-1(d)(1)(A), and 17 C.F.R. § 143.8(a)(1), for the time at issue here, the civil monetary penalty may not be more than the greater of $130,000 for each violation of the Act or triple the monetary gain to Defendants.

The CFTC has suggested several factors to be considered in assessing a civil monetary penalty.  These factors include: the relationship of the violation at issue to the regulatory purposes of the Act and whether or not the violations involved core provisions of the Act; whether or not scienter was involved; the consequences flowing from the violations; financial benefits to a defendant; and harm to customers or the market.  *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd*, 137 F.3d 1300 (11th Cir. 1998).  Civil

---

[5] The Court's January 22, 2013, Consent Order of Permanent Injunction Against Welke (Filing No. 85) imposed a $257,000 disgorgement obligation.  The restitution obligations imposed herein against Arrington, EMHC, and MJM, shall be offset or credited by any disgorgement amount paid by Welke.  Similarly, any restitution amount paid by Kratville pursuant to any order of this Court should be offset or credited against the restitution obligations imposed herein.

monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the Act and Regulations so that the defendant would rather comply than risk violations.  *Id.*  The CFTC has stated:

> [Civil monetary] penalties signify the importance of particular provisions of the Act and the [CFTC]'s rules, and act to vindicate these provisions in individual cases, particularly where the respondent has committed the violations intentionally.  Civil monetary penalties are also exemplary; they remind both the recipient of the penalty and other persons subject to the Act that noncompliance carries a cost.  To effect this exemplary purpose, that cost must not be too low or potential violators may be encouraged to engage in illegal conduct.

*In re GNP Commodities, Inc.* [1990-92 Transfer Binder] Com. Fut. L. Rep. (CCH) ¶ 25,360 at 39,222 (CFTC Aug. 11, 1992); *see also Reddy v. CFTC*, 191 F.3d 109, 123 (2d Cir. 1999) (providing that civil monetary penalties serve to further the Act's remedial policies and to deter others from committing similar violations).

This case warrants the imposition of a substantial civil monetary penalty against Arrington, EMHC, and MJM because they knowingly engaged in fraud, which is a core violation of the Act.  Specifically, Arrington, EMHC, and MJM knowingly engaged in an illegal scheme by, *inter alia*, (i) misappropriating pool participants' funds; (ii) issuing false account statements; and (iii) making material misrepresentations.  The Court concludes that a civil monetary penalty in the total amount of $2,872,039.89 against Defendants EMHC and MJM, for which EMHC and MJM will be jointly and severally liable, is justified in this case.  This represents (1) the statutorily permitted amount of three times EMHC's and MJM's gain ($827,346.63) for EMHC's and MJM's violations of

27

the anti-fraud provisions of the Act and Regulations (§§ 6b(a)(2)(i)-(iii) (for conduct occurring prior to June 18, 2008), 6b(a)(1)&(2)(A)-(C) (for conduct occurring after June 18, 2008), 6o(1), and 4c(b) of the Act; and 17 C.F.R. §§ 4.41 (2013) & 33.10 (repealed 2012)), plus (2) an additional $390,000 ($130,000 times 3) for EMHC's and MJM's violations of the three registration and financial disclosure requirements of the Act and Regulations, §§ 6m(1) & 4k(2), and 17 C.F.R. 4.21 (2013).  The Court also concludes that a civil monetary penalty of $1,687,102.98 against Arrington is justified.  This represents the statutorily permitted amount of three times Arrington's gain ($562,367.66).  Arrington, as a control person of EMHC and MJM, also shall be jointly and severally liable for EMHC's and MJM's civil monetary penalty.

The amount of the civil monetary penalty is appropriate given the repeated and egregious nature of Defendants' fraudulent scheme.  *See CFTC v. Hays*, Civil No. 09–259 (DWF/AJB), 2011 WL 311366, at *4 (D. Minn. Jan. 28, 2011) (imposing the maximum civil penalty of triple the amount that defendant gained where his violations were knowing and continuous and involved over 100 customers).  The conduct of Arrington, EMHC, and MJM included aggravating factors that support a civil monetary penalty of three times their gain.  Their scheme involved more than 100 pool participants, was ongoing for several years, and included obstructive conduct to conceal the ongoing unlawful activity (*i.e.*, lying to NDBF about shutting down the entities and returning pool participants' funds).

Accordingly, this Court orders Defendants EMHC and MJM to pay a civil monetary penalty in the amount of $2,872,039.89, plus post-judgment interest, for which

Arrington, EMHC, and MJM are jointly and severally liable.  This Court also orders Defendant Arrington pay a civil monetary penalty of $1,687,102.98, plus post-judgment interest.  Post-judgment interest on this civil monetary penalty shall accrue beginning on the date of entry of this Order and shall be calculated using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961 (2006). Defendants shall follow the instructions for remitting payment for the civil penalty according to the order section set forth below.

IT IS ORDERED:

1. The Motion for Default Judgment against Jonathan Arrington, Elite Management Holdings Corp., and MJM Enterprises LLC (Filing No. 109), filed by the Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC"), is granted;

2. Defendants Arrington, EMHC, and MJM and any of their agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them are permanently enjoined from directly or indirectly:

   a. violating 7 U.S.C. § 6b(a)(1) & (2) (2012); 7 U.S.C. § 6o(1) (2012); 7 U.S.C. § 6c(b); 7 U.S.C. § 6m(1); 7 U.S.C. § 6k(2); and 17 C.F.R. §§ 4.21 & 4.41 (2013);

   b. trading on or subject to the rules of any registered entity as that term is defined in 7 U.S.C. § 1a(40) (2012);

   c. entering into any transactions involving commodity futures, options on commodity futures, commodity options as that term is defined in 17 C.F.R. § 1.3(hh) (2013) (commodity options), and/or foreign currency, as described in 7 U.S.C. §§ 2(c)(2)(B) and 2(c)(2)(C)(i) (forex contracts), for their own personal account or for any account in which they have a direct or indirect interest;

   d. having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

   e. controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity

29

futures, commodity options, security futures products and/or forex contracts;

    f.    soliciting, receiving, or accepting any funds from any person for purposes of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts;

    g.    applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2013); and/or

    h.    acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a)  registered, exempted from registration or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2013);

3.    Injunctive and Equitable Relief: The injunctive and equitable relief provisions of this Order shall be binding on Defendants Arrington, EMHC, and MJM and any persons who are acting in the capacity of agent, employee, servant, or attorney of Arrington, EMHC, and MJM, and any person acting in active concert or participation with Arrington, EMHC, and MJM, who receives actual notice of this Order by personal service or otherwise;

4.    Defendants Arrington, EMHC, and MJM will pay, jointly and severally, restitution in the amount of $3,833,982.02, plus post-judgment interest; according to the following procedures:

    a.    Post-judgment interest on Defendant Arrington's, EMHC's, and MJM's restitution obligations shall accrue beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961;

    b.    Defendants Arrington, EMHC, and MJM will make their respective restitution obligation payments payable in the name of EMHC/MJM Settlement Fund and shall send such restitution payments by either electronic funds transfer or by U.S. postal money order, certified check, bank cashier's check, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois, 60606, under a cover letter that identifies the paying Defendant and the name and docket number of this proceeding. The paying Defendant shall simultaneously

transmit copies of the cover letter and the form of payment to (a) Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581; (b) Director, Division of Enforcement, at the same address, and (c) Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address;

c.     The National Futures Association ("Monitor") shall oversee Defendant Arrington's, EMHC's, and MJM's restitution obligations and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to the Defendants' customers identified by the CFTC or may defer distribution until such time as the Monitor may deem appropriate in its discretion.  In the event that the amount of restitution payments to the Monitor are of a de minimis nature such that the Monitor determines that the administrative costs of making a restitution distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth below.  To the extent that any funds otherwise accrue to the U.S. Treasury as a result of Defendant Arrington's, EMHC's, and MJM's restitution obligations, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in the preceding paragraphs;

d.     Defendants Arrington, EMHC, and MJM are required to cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary to identify customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any restitution obligation payments.  Defendants Arrington, EMHC, and MJM shall execute documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward their respective restitution obligations;

e.     Any amount paid to any customer pursuant to this Judgment shall not limit the ability of that customer to prove independently in a separate action that a greater amount is owed from Defendants Arrington, EMHC, and MJM or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under federal, state, or common law to assert a claim for recovery against Defendants Arrington, EMHC, and MJM, subject to any offset or credit that Defendants

31

Arrington, EMHC, and MJM may be entitled to claim under the law governing that customer's claim;

f.      Under Rule 71 of the Federal Rules of Civil Procedure, each customer of Defendants Arrington, EMHC, and MJM who suffered a loss is hereby explicitly made an intended third-party beneficiary this Judgment and may seek to enforce compliance with this Judgment to obtain satisfaction of any portion of the restitution amount that has not been paid, to ensure continued compliance with any provision of this Judgment, and to hold Defendants Arrington, EMHC, and MJM in contempt for any violations of any provision of this Judgment;

g.      Any payment that Arrington makes toward his restitution obligation will be credited to reduce the amount of EMHC's and MJM's restitution obligation;

5.    Defendants EMHC and MJM are ordered to pay a civil monetary penalty in the amount of $2,872,039.89, plus post-judgment interest, for which Arrington, EMHC, and MJM are jointly and severally liable;

6.    Defendant Arrington is ordered to pay a civil monetary penalty of $1,687,102.98, plus post-judgment interest;

7.    Post-judgment interest on this civil monetary penalty shall accrue beginning on the date of entry of this Order and shall be calculated using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961 (2006);

8.    Defendants Arrington, EMHC, and MJM shall pay their civil monetary penalty in accordance with the following procedures:

a.      Defendants Arrington, EMHC, and MJM shall pay their civil monetary penalty by electronic funds transfer, or by U.S. Postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
ATTN:  Accounts Receivables --- AMZ 340
E-mail Box: 9-AMC-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169

Telephone: (405) 954-5644

b.    If payment is to be made by electronic funds transfer, the Defendant shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions;

c.    Defendants Arrington, EMHC, and MJM shall accompany payment of the penalty with a cover letter that identifies the paying Defendant and the name and docket number of the proceedings. The paying Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, U.S. Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address;

d.    Any acceptance by the CFTC or the Monitor of partial payment of Defendant Arrington's, EMHC's, and MJM's restitution and/or civil monetary penalty obligation shall not be deemed a waiver of their obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance;

9.    Defendants EMHC and MJM are jointly and severally liable as principals of Defendant Kratville for Kratville's restitution obligation, as described in the Court's Judgment against Kratville entered this day, in the amount of $534,386.69, including post-judgment interest;

10.    Defendants EMHC and MJM are jointly and severally liable as principals of Defendant Kratville for the civil penalty imposed in the Court's Judgment against Kratville entered this day, in the amount of $1,170,000, including post-judgment interest; and

11.    A separate judgment will be entered.

Dated this 28th day of January, 2014.

BY THE COURT:

s/Laurie Smith Camp
Chief United States District Judge