**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION,** | **CASE NO. 8:11CV181** |
| **Plaintiff,** | |
| **vs.** | **MEMORANDUM AND ORDER** |
| **JONATHAN W. ARRINGTON, ELITE MANAGEMENT HOLDINGS CORP.,  MJM ENTERPRISES LLC, MICHAEL B. KRATVILLE, and MICHAEL J. WELKE,** | |
| **Defendants.** | |

This matter is before the Court on the Motion for Summary Judgment (Filing No. 97), filed by the Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC") against Defendant Michael B. Kratville. For the reasons stated below, the CFTC's Motion for Summary Judgment will be granted.

## BACKGROUND

The CFTC filed its Complaint on May 23, 2011 (Filing No. 1) alleging that Defendants Jonathan Arrington ("Arrington"), Michael B. Kratville ("Kratville"), Michael J. Welke ("Welke"), Elite Management Holdings Corp. ("EMHC"), and MJM Enterprises LLC ("MJM") (collectively "Defendants") fraudulently induced more than 130 individuals to invest $4.7 million in commodity pools operated by Defendants, in violation of the Commodity Exchange Act (the "CEA" or the "Act"), 7 U.S.C. §§ 1 *et seq.*, and its implementing regulations, 17 C.F.R. §§ 1.1 *et seq.* 2.

The facts below are admitted by the parties, or are stated in the briefs and supported by pinpoint citations to admissible evidence in the record and not properly resisted as required by NECivR 56.1[1] and Fed. R. Civ. P. 56.

## I.      Origin of Elite Investment Group

In or around 2004, Kratville and Welke were members of an "investment club" run by Arrington and Neil Labelle ("Labelle"), called Elite Index Investment Group.  Through a $25,000 investment in January 2004, Kratville joined Elite Index Investment Group, which was incorporated in February 2004, and began trading, as early as September 2003. Elite Capital Management Group, LLC, operated Elite Index Investment Group and another "investment club," Elite Aggressive Growth Group, established in February 2004.  At some point during the summer of 2005, Labelle assigned Elite Index Investment Group and Elite Aggressive Growth Group to Arrington.  At that time, some or all members received their funds back.  Kratville got his money back in May 2005, receiving slightly less than he invested, because his Elite Index Investment Group investment resulted in a loss.  Neither Elite Aggressive Growth Group nor Elite Index Investment Group showed consistent profitability.

## II.     FXIG

FXIG was a trading group, run by Fred Honea ("Honea") in Spain, that reported monthly trading returns ranging from 8.6% to 34.6% per month from May 2002 through May 2005.  FXIG reported that it traded in the spot and futures markets for commodities, precious metals, and foreign exchange ("forex"), and that it operated as a pool so every

---

[1] "Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response."  NECivR 56.1(b)(1).

account's return would be the same. FXIG promised high returns with limited risk because no more than ten percent of an individual's funds would be invested at any one time.

Kratville learned about FXIG from his friend Steven Vlach ("Vlach"). After Kratville learned about FXIG, he invested by sending $10,000 to $15,000 to Vlach. FXIG moved money from Vlach's account to create at least one account for Kratville. When Vlach talked to Kratville about FXIG, he cautioned him, stating he should get his original money out as soon as he doubled his money—because funds like FXIG can go awry or do really well and then hit a snag. Kratville later introduced Arrington and Welke to FXIG. In or around July or August 2005, Arrington, Kratville, and Welke traveled to Las Vegas to meet Honea and learn more about FXIG. Arrington, Kratville, and Welke never saw any trading statements because Honea refused to show them.

### III.    Background of "Elite" Companies

Arrington, Kratville, and Welke formed Defendant Elite Management Holdings Corporation ("EMHC") in July or August 2005, to pursue investment opportunities, and they decided to invest with FXIG. Kratville, Arrington, and Welke were all equal owners of EMHC, and they were all officers; with Kratville serving as secretary. EMHC became the holding or parent company for the two pools assigned from Labelle to Arrington—Elite Index Investment Group and the Elite Aggressive Growth Group (the "Elite Pools"). In or around January 2006, Kratville, Arrington, and Welke also opened Elite Management Index Fund ("EMIF"), managed by EMHC.[2]  Neither Arrington, Welke, nor Kratville registered EMHC with the CFTC as a commodity pool operator, nor did they register individually as

---

[2] The three investment pools—Elite Aggressive Growth Group, Elite Index Investment Group, and Elite Management Index Fund—will be referred to collectively in this Memorandum and Order as the "Elite Pools."

3

associated persons of a commodity pool operator.  EMHC never registered or filed an exemption of registration with the CFTC.

The Elite Pools had target return structures that capped the returns to which an individual pool participant would be entitled in a given month. Arrington, Kratville, and Welke were to keep all returns above the monthly caps, and all business expenses were to be borne by them.  The returns were to be made by investing in FXIG.

Kratville had several roles in EMHC.  When a prospective pool participant appeared interested in investing, Kratville referred the name to Arrington. Kratville, Arrington, and Welke communicated with each other about whom they were contacting to invest with the Elite Pools.  Kratville was originally a signatory on at least two bank accounts for EMHC, but Arrington removed Kratville as a signor for the accounts as of December 27, 2006.

Kratville also acted as the attorney for EMHC and the Elite Pools, and appeared before the Nebraska Department of Banking and Finance ("NDBF") in that capacity. Kratville had input into the decision to use FXIG; identified prospective pool participants; and spoke with potential pool participants about investing in the Elite Pools. Kratville reviewed and contributed to the Elite Pool website, brochure, prospectus, and monthly newsletter called "eWires," when they were used to solicit prospective pool participants. Kratville used both telephones, mail, and emails to communicate with Arrington, Welke, prospective pool participants and pool participants about EMHC and the Elite Pools, and helped pool participants access the Elite Pools' website.

## IV.   Solicitation of Elite Pool Participants

In August 2005, Kratville began to provide information about the Elite Pools to prospective pool participants, including family and friends. That month, Kratville emailed at least two prospective pool participants, telling them that he formed an investment company

4

that would pay people 4-6% per month "because of the ability of our trader to generate consistent profits of at least 6% every month since 2002." (Filing No. 100-5 ¶ 4; Filing No. 102-6 at ECF 12.) Kratville provided the prospective pool participants with a link to the EMHC website and stated, "I have been a part of this fund since 2002" and "expect to hit the 6% mark again by the end of the month…for the 40th month in a row." (Filing No. 100-5 ¶ 4; Filing No. 102-6 at 12.) Neither Kratville's email nor the EMHC website referenced FXIG.

In the months following August 2005, Kratville represented to prospective pool participants that the Elite Pools had returned at least four to six percent per month for several months.  Kratville noted that there was a risk with the investment, but stated that the risk was limited because only a small portion of the fund was invested at any time. The Defendants did not mention any association with FXIG. Their website also stated that only a portion of the fund was invested at any time.

Kratville followed up with one of his clients, Ed Voges ("Voges"), several months after making representations to prospective investors.  In his emails to Voges, Kratville stated, "We have hit at least 6% every month since 5/02…and we don[']t get paid unless we hit your goal level first, and we charge no fees." (Filing No. 100-5 at ECF 14.) Kratville also stated, "We are an investment club exempt from the SEC rules…so no filings." (*Id.* at ¶ 3, ECF 20.)  Kratville stated "our main clients are people in our age group with IRAs and 401ks that can be rolled over into our fund and where people are looking to let it grow for a minimum of 3 years. We accept cash, of course, but we feel we do the most good for people that roll[] over tax-deferred vehicles."  (*Id.* at ECF 16.)

Although the EMHC website did not mention FXIG, the EMHC website and marketing materials adopted FXIG's trading strategy as its own.  The EMHC website made

5

several representations about its trading record and strategy stating, "Our Executive Trader and trading group designed our Special Growth Strategy over a 10+ year[s] of testing and trading. The principal investment markets that this strategy utilizes are equities, commodities, precious metals and currencies." (Filing No. 102-2 at ECF 3.) The website also stated that this strategy has "had many multi-million offers to buy the system, but the desire has been, and still is to help the small guy build a nest egg and to remain entirely proprietary." (*Id.*) The website advertised that EMHC's "Special Growth Strategy" used "sophisticated procedures to prevent losses." (*Id.*) Specifically, the website explained, "No more than 10% of principal is invested at one time, yet the results are unparalleled." (*Id.*) The website stated that the investment goal was a 4, 4.5, or 5 percent monthly-capped return, compounded monthly depending on the principal investment. The website touted, "Over the last 48 month[s] this strategy has met it[]s return goals every month." (*Id.*)

Kratville forwarded the monthly newsletter eWire to potential pool participants to see if they were interested in the pool. The newsletters included representations about the trading returns, and stated that EMHC hit the maximum target goal for several months in a row. The eWires newsletters did not refer to FXIG. Kratville reviewed the EMHC prospectus and brochure with prospective pool participants; sent other prospective pool participants the brochure in the mail; and directed Arrington to contact prospective pool participants to provide them with the brochure and prospectus.

The brochure and prospectus also made several representations about EMHC's trading strategy, including that the pool's special growth strategy was designed over a 12-year period of testing and trading; that the strategy had attracted multi-million dollar offers to buy the system; that even though there was no guarantee monthly target goals could be met, such goals had been met every month since 2002; and that a successful local

6

attorney—Kratville—was an active long-term investor in EMHC.  The prospectus listed EMHC's primary broker as TradeStation Securities in Florida, and its clearing house broker as R.J. O'Brien in Chicago, Illinois; and stated the investments were equities, commodities, precious metals, and currency, in both the futures and spot markets.  Neither the brochure nor the prospectus stated that money would be sent out of the country, and Kratville did not tell potential pool participants that investments would be sent out of the country.  EMHC never had trading accounts at TradeStation Securities or R.J. O'Brien, and, while the Elite Aggressive Growth Group did hold accounts there, those accounts had ceased trading by the end of April 2005—before the Defendants began soliciting pool participants and before EMHC was formed.  Neither EMHC nor the Elite Pools had a proprietary trading system, and the Defendants never received any offers to purchase their system.

Kratville explained to his friend Pat Shannon ("Shannon") in October 2005, that if he told people about FXIG, no one would invest with the Elite Pools. In an email between Welke and Kratville, Welke stated "that it would be best if they didn[']t know who ou[r] people are . . .I just think we should try to hold on as long as we can without giving out any names or info since that is our 'secret ingredient' which is our recipe for success."  (Filing No. 101-2 at ECF 42-43.)  With respect to sales agents, Kratville told Shannon that EMHC could not hire anyone who had a license because "there are reporting rules for people with licenses if they are working with funds that are not licensed like ours."  (Filing No. 103-1 at ECF 17.)  Kratville explained to Shannon that the sales agents they were hiring "have connections with lots of rich people" and that they raised $1.5 million in 2005 "all in less than 4 months…hoping to hit $10 million in principal in 2006…then we can all retire for real."  (*Id.*)

Between July 7, 2005, and April 30, 2006, EMHC received almost $2.3 million in funds from pool participants.  The Elite Pools paid approximately $100,000 back to pool participants and sent $1.7 million to be traded on behalf of the Elite Pools.  All the Elite Pool funds were commingled, and the Elite Pools were set up so pool participants would share losses equally, based on the amount invested.

## V.    Inquiry from Nebraska Department of Banking and Finance

On May 15, 2006, Arrington received a letter from the NDBF regarding the investments sold by EMHC through its website, which he forwarded to Kratville. The letter referenced the EMHC website; asked for detailed business descriptions and copies of all promotional materials used; and inquired as to the identity of EMHC's traders.  The letter stated that neither the offer or sale of the investments or other securities could continue until the status of EMHC was determined.

Kratville spoke with an attorney the following day, inquiring about the jurisdiction of the NDBF.  Kratville asked "if we open up another LP in another state, refund the money to Nebraska residents, and then have people give us back the money we just gave them to put into the new LP located outside of Nebraska…do you think that would suffice?"  (Filing No. 102-6 at ECF 39.)  The attorney explained the jurisdictional reach of the NDBF was broader than that.  In a subsequent email from Kratville to Arrington, Kratville said "[d]espite [the attorney's] advice, I think the better course of action is to not refund the monies at this time and try and stretch out the discussion process as long as possible (I have some ideas on that) until the point where [they] likely [will] tell us to shut down.... I am curious whether we need to consider LPs in just another state or whether we need to even move it offshore. Just an idea."  (Filing No. 102-6 at ECF 41.)  On May 25, 2006, Kratville, Arrington and Welke created NIC, LLC ("NIC") and MJM Enterprises, LLC ("MJM") in Wyoming. On June

5, 2006, Arrington, Kratville, and Welke met and decided that MJM would be allowed to open bank accounts in Iowa.  Arrington opened bank accounts in Iowa on behalf of EMHC and at least one of the Elite Pools.

Kratville drafted and sent a response to the NDBF inquiry on May 26, 2006.  In his letter, Kratville explained that he, Arrington, and Welke directed the investment club's strategy on a daily basis and therefore the three of them were the "trading group," as had been referenced on the website.  He also stated that Arrington was the "executive trader," though he noted that all three had extensive trading experience. Kratville and Welke met with the NDBF on June 16, 2006.  At that meeting, Kratville and Welke represented that Kratville, Welke, and Arrington were the sole officers of EMHC, and they made decisions by consensus.[3] Kratville represented that EMHC invested in commodities and currencies but did not mention FXIG. Kratville told the NDBF that there were no pool participants from any other states; that no more than 10 percent of anyone's principal was at risk at any one time; and that the Elite Aggressive Growth Group had made at least 5% every month for 48 months.

The NDBF determined that EMHC failed to disclose to investors the risks of investing in commodities; the details regarding the multi-million dollar offers to buy their alleged trading system; information supporting the 48-month 5%-plus earnings claim; and Arrington's, Kratville's and Welke's trading qualifications. The NDBF asked that the Elite Pools complete a full recession—returning everyone's money, both principal and gain—explaining that because they were selling securities, and their structure, numbers, and representations were flawed, full recession would be the only adequate cure for the flaws.

---

[3] Kratville disputes that he was part of the consensus, and states that many decisions were made by Arrington and Welke without consulting Kratville. Kratville does not support this assertion with any reference to the record, and it is deemed admitted.

The NDBF explained that if EMHC did not agree to shut down and return all investor funds, the NDBF would sue them.  Kratville and Welke agreed to follow the NDBF's directive and to notify Arrington.

**VI.    Representations to Pool Participants about the NDBF Inquiry**

During the last week of May 2006, before their meeting with the NDBF, Arrington, Kratville, and Welke held a meeting for the pool participants of the Elite Pools. At the meeting Kratville and Arrington both spoke. Kratville announced that the State of Nebraska had issues with how the Elite Pools were set up, but nothing was wrong, and that everything continued to go well with the Elite Pools.  Kratville, Arrington, and Welke sent out two letters dated July 5, 2006, to every pool participant.  The first letter, identical to a letter Kratville sent the NDBF for approval, stated that after consideration and cooperation with the NDBF, Kratville, Arrington, and Welke decided to dissolve the investment clubs, effective July 2006. The letter then provided the account balance that would be returned to the pool participant. The letter asked the pool participant to have the letter notarized, indicating that the pool participant had received his or her funds.

A second letter sent to pool participants—but not provided to the NDBF—stated "[w]ith the dissolving of the current [Elite Pools], and you now joining NIC, LLC, we wanted to provide you with an accurate rollover balance. This is an internal document for you only. Do not provide this information to anyone."  (Filing No. 100-5 at ECF 35.)  The letter listed the pool participant's balance and instructed the pool participant to contact Kratville, Arrington, and Welke with any questions.

Kratville emailed the letters to pool participant Voges and, in conversations with Voges, explained that the NDBF did not like limited partnerships, such as the Elite Pools. Kratville told pool participant Gary McConnell ("McConnell") that because of the legal

10

organization of the Elite Pools or a tax problem, they had to open the new entity. Kratville told other pool participants that the rollover documents were part of a routine inquiry or were simply a formality. When he told pool participants about the rollover, Kratville stated that everything would remain the same, including the traders and the risk limitation, and the only thing that would be different was the name.  After the rollover, several of the pool participants of the Elite Pools became pool participants of NIC LLC ("NIC Pool"), the pool managed by MJM.  MJM never registered or filed an exemption of registration with the CFTC.

Kratville, Arrington, and Welke collected copies of the first letter, signed by the Elite Pool participants living in Nebraska, and Kratville sent them to the NDBF.  In one of Kratville's letters to the NDBF, Kratville stated "I have been telling people that the clubs are shut down and when the state's inquiry is concluded that we expect to meet with you to find out exactly what guidelines you will have us follow and that we hope to open back up at that time…." (Filing No. 102-4 at 139-140.)  Kratville noted allegations against the investment club, and stated, "We have done everything that you have asked, have been cooperative in every way imaginable, and so we find it disturbing that someone is now providing false information to you."  (*Id.*)

When preparing his response to the NDBF, Kratville emailed Arrington and Welke, stating "it is quite clear to me that if the State ever finds out we have the Wyoming entity and we have moved everyone over, that they will go after our nuts." (Filing No. 102-6 at ECF 44.)[4] He went on to say, "in an abundance of caution, I deleted everything on my computer that refers to FXIG or Elite. If the state would ever come grab our computers, the

---

[4] Kratville alleges that the emails containing these statements may have been altered.  For the reasons stated below, the evidence Kratville offers in support of this accusation is improper.

less on them the better. I would advise us to store any such documents on little zip drives, portable drives, on Hotmail or Yahoo accounts, etc." (*Id.*) He further stated he did not "have any of our emails in" his Outlook, and "[b]etter safe than sorry." (*Id.*)

Between May 15, 2006 (the time the NDBF directed the Defendants to stop soliciting and accepting funds for the pools) and August 31, 2006, Defendants collected more than $680,000 in funds from pool participants. A little over $3 million in pool participants' funds was invested in the investment club as of that date. Of this amount, Defendants had paid pool participants back almost $250,000; had sent a little over $2 million to be traded; and had taken or spent more than $400,000.

## VII.    Concerns With FXIG

Kratville learned of more problems with FXIG at the same time he, Arrington, and Welke were working on the rollover of pool participants to the NIC Pool. Specifically, the traders for FXIG took the month of June 2006 off, and the website was unavailable for much of the summer. By late August or early September, FXIG posted that 41% of its funds were in open negative trades. Kratville raised questions with other FXIG investors during this time, as well as with Arrington and Welke. Kratville said 39% of the fund was in negative trades in September 2006 and noted that he had no basis to ascertain the value of the Elite Pools' account. (Filing No. 102-6 at ECF 48.) By November, FXIG reported the negative trade figure was 37% of the fund. In December, FXIG announced that it would transfer all remaining funds to Sharndor Logistics and that dollars would be converted to units—each dollar of principal would be a class A unit and each dollar of growth would be a class B unit.

## VIII.    Statements to NIC Pool Participants

NIC Pool participants received statements showing their returns were 6% for July 2006, 3% for August 2006, 6% for September 2006, 3.02% for October 2006, 3.5% for

November 2006, and 3.07% for December 2006. NIC Pool participants did not receive any notification of any problems at FXIG, and their trading statements continued to show the pool participants' entire principal intact.  The Defendants' reports suggested the entire pool was worth approximately $3.06 million in July 2006, $3.21 million in August 2006, $3.72 million in September 2006, $4.21 million in October 2006, $4.38 million in November 2006, and $4.89 million in December 2006.  During that time, however, even assuming the money at FXIG was not yet lost, the total worth of the trading accounts ranged from $3.01 million in July 2006 to $3.9 million in December 2006—all below the reported returns. The percentages that should have been reported based on the trading were 3.89% for July 2006, 3.52% for August 2006, 0.28% for September 2006, 0 for October 2006, 0.17% for November 2006, and -7.76% for December 2006.

During this time, Kratville had discussions with Arrington and Welke about reports to NIC Pool participants.  In those emails, Kratville agreed that quarterly postings would avoid monthly reporting issues.  (Filing No. 102-6 at ECF 51.)

## IX.    FXIG's Total Loss in 2007

By February 2007, Sharndor posted that the funds they received for FXIG members were less than a penny on the dollar, (Filing No. 103-3 at ECF 2), and Kratville emailed Arrington and Welke that he was "frustrated because we are handling ot[he]r peoples' money and basically have had to hide these problems from our investors." (Filing No. 102-6 at ECF 68.)  At one point, Kratville noted "it seem[s] like it is almost all gone" and "we should just file bankruptcy now." (Filing No. 102-6 at ECF 79, 84.) In March 2007, Honea posted that he tried to make back losses but further withdrawals crashed the system, and he could not estimate how long it would be to make the customers whole.  Kratville emailed Arrington and Welke about meeting that week and stated "Bankruptcy is the only option

13

right now legally. But I am open to options."  (Filing No. 102-6 at ECF 84.)   On April 18, 2007, Kratville emailed Welke and Arrington about the necessity of coming up with a timeline to show "when F [Fred Honea] locked the accounts from taking money out…what we did to deal with Fred, to obtain more info, to press him for more info, etc." (Filing No. 102-6 at ECF 88.)

In the first few months of 2007, Kratville discussed the upcoming statements owed to the pool participants, stating "[t]he idea of doing an April 1st report scares the hell out of me," and he mentioned that April 1st was a "ticking time bomb." (Filing No. 102-6 at ECF 68, 69, and 73.) Kratville acknowledged that the investments were almost gone and they would be lucky to recover ten percent of their funds, noting it "create[d] a hell of an issue for us come April 1st." (Filing No. 102-6 at ECF 79-80.)   The NIC Pool participants received statements for the first three months of 2007 showing positive returns and no loss of principal. The statements showed a 3.20% return for January, 3.30% return for February, and a 4.50% return for March.  The total balance that Defendants reported to all of the pool participants was about $5.1 million in January 2007, $5.3 million in February 2007, and $5.8 million in March 2007.

The NIC Pool's actual results were, taking into account the loss at FXIG in February 2007, 6% in January 2007, -79.27% in February 2007, and 6% in March 2007.  The total balance the Defendants had in their trading accounts was $4.2 million in January 2007, $889,000 in February 2007 (realizing the loss at FXIG), and $1.1 million in March 2007.  On April 18, 2007, Kratville emailed Arrington and Welke suggesting that, based on concerns as to whether they could ever withdraw money from FXIG, they should post something on the website that "won[']t arouse a lot of suspicion" such as: "In auditing all 3 of our traders' information for the first quarter, we have a few questions that we want to go over with one of

14

our traders and after we do so, we may post a different number for the quarter." (Filing No. 102-6 at ECF 89.)   NIC Pool participants received statements reporting 3.01% growth for April 2007, 3.04% growth for May 2007, and 3.03% for June 2007.   By June 2007, the Defendants were reporting a total of $6.31 million in balances to pool participants.   In reality, the pool lost money each of those months, and, as of the end of June 2007, the pool should have reported a balance of $690,218.88.   The percentages reported should have been -5.95%, -10.61%, and -26.11% for April, May, and June 2007, respectively.   Through the end of April 2007, Kratville, Arrington, and Welke collected more than $4.3 million in pool participant funds, they paid out approximately $550,000 in returns, and they sent a net $3 million to trading entities.

In March 2007, Kratville met with NIC Pool participant and long-time friend, BJ Tobin ("Tobin").   Tobin was one of the two pool participants that knew about Honea and FXIG. Tobin expressed concern about whether the NIC Pools were in trouble.   Kratville told Tobin they were using "several traders, not just one" and that he had no information about how FXIG had done for a few months.  (Filing No. 102-6 at ECF 83.)

In February 2007, Kratville, Arrington, and Welke discussed a variety of ways to try to recover the money.   Kratville worried that "someone will find out that we have been acting illegally too. If this thing blows up, I will lose my bar license ... My other fear is that if th[is] blows up that I will lose all of my assets paying our members. Playing hardball cou[l]d result in [the] state and feds finding out what we were doing...." (Filing No. 102-6 at ECF 71.)   In May 2007, Kratville communicated with another FXIG investor about recovery efforts. Kratville stated that Arrington was going to Spain to recover funds for "our investors." (Filing No. 103-1 at ECF 20-37.)

15

Beginning as early as October 2007 and through as late as January 2008, NIC Pool participants learned of the loss of the value of their accounts.  By the end of 2007, Kratville, Arrington, and Welke had collected $4.6 million in pool participants' funds, they had paid out almost $850,000 in returns to existing pool participants, and had sent a net of approximately $3 million to trading entities. In total, there were 112 pool participants, counting couples as one pool participant. As NIC Pool participants learned of the loss, or suspected something was wrong, many contacted Kratville, who told them he never joined MJM or its pool, NIC. (Filing No. 99-1 ¶ 16, Filing No. 100-3 ¶ 25, Filing No. 100-2 ¶ 19, Filing No. 100-4 ¶ 11, Filing No. 100-5 ¶ 23.)  Kratville provided the CFTC with documents purporting to show he resigned from MJM and NIC on June 23, 2006. The resignation documents drafted by Kratville included stipulations that he continue to be informed about any traders used by MJM or NIC; that any information he learned about MJM, NIC, or their traders would be kept confidential; that he would not disclose his resignation to any one; that he would not compete with EMHC, NIC, or MJM; and that EMHC, NIC, or MJM would pay for his golf club membership dues through July 2007.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gage v. HSM Elec. Prot. Servs., Inc.*, 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)).  The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor." *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir 2011).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue . . . Rule 56(e) permits a proper summary judgment motion to be opposed

16

by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The moving party need not negate the nonmoving party's claims by showing "the absence of a genuine issue of material fact." *Id.* at 325. Instead, "the burden on the moving party may be discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case." *Id.*

In response to the movant's showing, the nonmoving party's burden is to produce specific facts demonstrating "'a genuine issue of material fact' such that [its] claim should proceed to trial." *Nitro Distrib., Inc. v. Alticor, Inc.*, 565 F.3d 417, 422 (8th Cir. 2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The nonmoving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (quoting *Matsushita*, 475 U.S. at 586-87)), *cert. denied,* 132 S. Ct. 513 (2011). "'[T]he mere existence of *some* alleged factual dispute between the parties'" will not defeat an otherwise properly supported motion for summary judgment. *Quinn v. St. Louis Cnty.*, 653 F.3d 745, 751 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986)).

In other words, in deciding "a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)). Otherwise, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no

17

"'genuine issue for trial'"–summary judgment is appropriate.  *Matsushita*, 475 U.S. at 587

(quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I.    Evidentiary Issues

####     A.    Invocation of Fifth Amendment in Civil Cases

The CFTC asks the Court to exercise its discretion and draw an adverse inference

against Kratville with respect to every question to which Kratville asserted his Fifth

Amendment privilege against self-incrimination. In his deposition before the CFTC, Kratville

was asked questions about the investment pools, the pool funds he traded, the allegedly

false emails and statements he sent to pool participants, and the pool funds he

misappropriated. Kratville invoked his Fifth Amendment right in response to most questions.

In civil cases, a trial court may, in its discretion, draw adverse inferences from the

invocation of that Fifth Amendment right.  *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976).

A direct inference of guilt or liability from a party's silence is forbidden, however. *See*

*LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995).  Thus, on a motion

for summary judgment, a moving party must submit evidence in addition to the mere

adverse inference. *See SEC v. Colello,* 139 F.3d 674, 678 (9th Cir.1998). In this case, the

CFTC has provided ample additional evidence to support its claims on summary judgment.

Accordingly, the Court will draw an adverse inference against Kratville with respect to his

responses to deposition questions in which he asserted his Fifth Amendment privilege, but

such inference is not crucial to the Court's findings.

####     B.    Credibility of Affidavit Testimony

Kratville claims that the CFTC's use of several affidavits is improper because the

affiants' credibility has been called into question and should be weighed by the trier of fact.

At the summary judgment phase, if the movant relies on testimony rather than documentary evidence, the movant carries a burden of demonstrating that "the witness is unbiased and competent, and whether his testimony is 'positive, internally consistent, unequivocal, and in full accord with the documentary exhibits.'" *United States v. Real Prop. Located at 3234 Washington Ave. N., Minneapolis, Minn.*, 480 F.3d 841, 845 (8th Cir. 2007) (quoting *Lundeen v. Cordner,* 354 F.2d 401, 408 (8th Cir.1966)).  "But 'where specific facts are alleged that if proven would call the credibility of the moving party's witness into doubt, summary judgment is improper,' especially when the challenged testimony 'is an essential element of the plaintiff's case.'"  *Id.* (quoting *Lundeen,* 354 F.2d at 408).  If the credibility of an interested witness is undermined in a material way by the non-moving party's evidence, summary judgment for the movant should be denied.  *Id.*

Kratville first claims that the credibility of Tony Leach and Pat Shannon is questionable. The Court disagrees. Kratville has not alleged specific facts that call into question Leach's affidavit. Further, the CFTC has not alleged any fact, nor has the Court relied on any fact, based solely on Leach's affidavit.  With respect to Shannon's affidavit, Kratville also has failed to allege specific facts calling into question Shannon's credibility. Kratville admitted or did not contest the CFTC's statement of material facts with respect to many of the issues touched upon in Shannon's affidavit.  Matters Kratville did contest are not material to CFTC's burden of proof, and relate only to differing interpretations of documents. Kratville relies on a challenge to Shannon's "credibility in general" based on Shannon's "history of failing to fully disclose the truth with respect to business dealings." (Filing No. 125 at 39.)  These general allegations are not specific, nor do they call into question the emails between Shannon and Kratville, nor Shannon's recollection. Accordingly, the Court has considered Shannon's affidavit.

19

Kratville also alleges that the CFTC's reliance on the affidavit of Defendant Arrington is improper, because emails referred to in Arrington's affidavit, evidencing communications between Kratville, Arrington, and Welke, may be inauthentic.  Kratville explains that he was provided only hard copies of the emails, and suggests a computer forensics expert must examine the hard drives to determine whether the emails have been altered.  Kratville supports this argument with the affidavit of David Burgess ("Burgess"), and represents Burgess to be a computer examinations expert.  (Filing No. 126-6.)  The affidavit states that Burgess completed a "cursory examination" of hard copies of emails, and concluded that "[p]ortions of some of the emails in question have been deleted, as is evidenced by missing components common to emails sent through [the service provider utilized by Kratville]."  (*Id.* ¶ 3.) The affidavit does not identify the emails alleged to have been deleted, nor does it explain how the content of the emails may have been manipulated.

The Court will not consider the Burgess affidavit, because Kratville did not timely disclose Burgess as an expert. Federal Rule of Civil Procedure 26 requires timely disclosure of expert witnesses.  Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Kratville disclosed Burgess as an expert the day before he filed his response to the CFTC's Motion for Summary Judgment.  He has not provided any justification for this untimely disclosure. Kratville received the hard copy emails during discovery, and the emails were used as exhibits during Kratville's deposition on March 29, 2013.  Kratville had more than sufficient notice of the emails, many of which were written by him, and adequate time to question their authenticity. Kratville has not demonstrated that his failure to disclose his forensics expert

was substantially justified or harmless. Accordingly, Kratville has failed to provide specific facts challenging Arrington's credibility, and the Court has considered the Arrington affidavit and emails in its analysis of the CFTC's Motion.

### C.    Effect of Settlement on Affidavits

Kratville argues the affidavits of Terry Buckley, Edward Voges, and BJ Tobin, should be stricken because each affiant signed a release and suffered no monetary damages. Kratville alleges that Voges and Buckley each agreed not to pursue any legal action against Kratville.[5] There is no allegation that the CFTC was a party to these settlement agreements. This Court has held that the CFTC is not barred from seeking restitution for victims who have signed settlement agreements and received money as a result. *CFTC v. Commercial Hedge Servs., Inc.*, 422 F. Supp. 2d 1057, 1060 (D. Neb. 2006) (Kopf, J.). This result is based on the "'well-established general principle' [ ] that 'the government is not bound by private litigation when the government's action seeks to enforce a federal statute that implicates both public and private interests.'" *Id.* (quoting *Herman v. South Carolina National Bank*, 140 F.3d 1413, 1425 (11th Cir.1998)). Buckley, Voges, and Tobin are not parties to this action, and their affidavits have been considered.

## II.    Fraud Under the Commodity Exchange Act

The CFTC alleges that Kratville committed fraud in violation of the Act and its implementing regulations. Specifically, the CFTC alleges fraud in connection with futures in

---

[5] Kratville alleges that Tobin suffered no monetary damages as a result of the alleged fraud, and asserts that all claims and evidence related to Tobin should be stricken from the record. Tobin is not a party to this lawsuit, and the CFTC may rely on his affidavit in support of its Motion.

violation of the CEA, 7 U.S.C. § 6b(a)(i) & (iii) (2006).[6] The CEA "is a remedial statute that serves the crucial purpose of protecting the innocent individual investor—who may know little about the intricacies and complexities of the commodities market—from being misled or deceived." *CFTC v. R.J. Fitzgerald & Co., Inc.,* 310 F.3d 1321, 1329 (11th Cir.2002). The purpose of the CEA is served through several antifraud provisions, including 7 U.S.C. § 6o(1). *See CFTC v. Field,* 249 F.3d 592, 593 (7th Cir.2001). To establish liability for fraud under the CEA, the CFTC must establish "(1) the making of a misrepresentation, misleading statement, or a deceptive omission; (2) scienter; and (3) materiality." *R.J. Fitzgerald*, 310 F.3d at 1328; *Dudley v. Dittmer*, 795 F.2d 669, 672-3 (8th Cir. 1986). "Unlike a cause of action for fraud under the common law of Torts, 'reliance' on the representations is not a requisite element in an enforcement action." *R.J. Fitzgerald*, 310 F.3d at 1328 n. 6. For the reasons stated below, the Court concludes that the CFTC has presented ample evidence of misrepresentations by Kratville; that his misrepresentations were material; and that his misrepresentations were made with scienter.

### A.    Misrepresentations and Omissions

The uncontroverted evidence shows that Kratville made misrepresentations and omissions. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed.'" *R.J. Fitzgerald,* 310 F.3d at 1328 (citing *Hammond v. Smith Barney Harris Upham & Co.* [1987–1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,617 at 36,657 & n. 12 (CFTC Mar. 1, 1990)). The CFTC has provided evidence that Kratville knew that EMHC's website, prospectus, and brochure falsely adopted FXIG's purported track record and proprietary trading system as its own.

---

[6] The CFTC cites 7 U.S.C. § 6b(a)(i) & (iii), which references the statute prior to the 2010 amendments and is applicable to claims arising against Kratville prior to the amendments. Statutory references to the 2006 version of the statute are noted herein.

(Filing No. 105-1, Kratville Dep., 65:9-67:16; Filing No. 100-5 ¶ 12; Filing No. 100-2 ¶¶ 9-11; Filing No. 99-1 ¶ 7; *see also* Filing No. 105-1, Kratville Dep. 112:14-116:3; 116:4-122:7; 105:8-109:24.)  For example, in the fall of 2005, Kratville told prospective pool participants that the Elite Pools had returned at least 4% to 6% per month since 2002, when the Elite Index Investment Group in fact did not begin trading until 2003 at the earliest, and the Elite Aggressive Growth Group was not established until 2004.   The 4% to 6% returns were reported by FXIG, not by the Elite Pools. The website and brochures sent to potential investors represented that EMHC received multiple million dollar offers to buy its system. The CFTC has submitted uncontroverted evidence showing that Kratville knew these representations were being made on the website and in brochures.[7]   Brochures sent to investors also represented that the system was proprietary.  (Filing No. 100-2 at ECF 11.) Kratville claims that if he provided misleading documentation or made false statements, he did so unknowingly and, in any case, the representations accurately reflected FXIG's record.[8] The issue is not whether the representations accurately described FXIG's purported track record, but whether it was misleading to represent FXIG's track record as that of EMHC, without mentioning FXIG. It is undisputed that neither EMHC nor any of the Elite Pools had a proprietary trading system, and the Defendants never received any offers to purchase their non-existent system.   Kratville admitted telling a friend that if he told

---

[7] Kratville argues he is somehow absolved of responsibility for these representations because they ran contrary to his legal advice, and he did not agree with the actions taken by Arrington and Welke. However, Kratville may be held personally liable for fraud for his own statements as well as statements of others made with his acquiescence.  *See e.g. SEC v. Conaway*, 698 F. Supp. 2d 771, 865-66 (E.D. Mich. 2010) (concluding that CEO who did not sign, draft, edit, or even review fraudulent filings could nevertheless be held personally liable). Kratville admits that he eventually acquiesced to Arrington and Welke, and in addition to being legal counsel, was an equal officer and owner of EMHC and MJM. Accordingly, Kratville can be held liable for the statements in marketing materials.

[8] Kratville does not cite to any evidence to support this position, and the CFTC's properly supported facts are deemed admitted.  *See* NECivR 56.1(b)(1); Fed. R. Civ. P. 56(c)(1)(A).

23

people about FXIG, no one would invest with the Elite Pools. The overall message of representing FXIG's purported track record as that of EMHC or the Elite Pools was misleading. *R.J. Fitzgerald,* 310 F.3d at 1328.

In addition to misrepresenting FXIG's purported record as its own, the Defendants' marketing materials made explicitly false representations.  For example, the prospectus listed EMHC's primary broker as TradeStation Securities in Florida, and its clearing house broker as R.J. O'Brien in Chicago, Illinois, and stated its investments were equities, commodities, precious metals, and currency, in both the futures and spot markets.  EMHC never had trading accounts at TradeStation Securities or R.J. O'Brien, and, while the Elite Aggressive Growth Group did hold accounts there, those accounts ceased trading by the end of April 2005—before the Defendants began soliciting pool participants and before EMHC was formed.  (Filing No. 101-1 ¶ 63; Filing No. 101-6 at ECF 26-36.)

Kratville also made personal representations to investors that were either false or misleading.  For example, he represented to investors that he was an active and long-term participant in EMHC. Kratville was an investor in Elite Aggressive Growth Group under Neil Labelle, but he received his money back in May 2005.  (Filing No. 104-4, Labelle Dep., 77:17-79:4.) Once the Elite Pools were operated by EMHC, Kratville deposited, at most, $500 of his own money in August 2005.  (Filing No. 101-1 ¶ 64).  Kratville makes the unsupported argument that the CFTC fails to define "active" and "long-term." These characterizations are insignificant.  Kratville has not submitted evidence to suggest he had been a long-term investor, and his exposure, if any, fell far short of the $10,000 minimum investment required of potential investors. (*See* Filing No. 99-2 at ECF 6.)  Accordingly, these statements were false or misleading.

Kratville also made misrepresentations to investors about the NDBF inquiries and direction.  When Kratville and Welke met with the NDBF on June 16, 2006, the NDBF informed Kratville that it was concerned about some disclosure issues on the EMHC website. (Filing No. 102-1 ¶ 12.)  The NDBF told Kratville and Welke that, because EMHC was selling securities without registering under Nebraska Law, EMHC would need to shut down and return all funds to investors.  (*Id.* ¶ 13.)  The NDBF explained that because of EMHC's significantly flawed structure, the only available cure for the violations was straight rescission to all investors.  (*Id.*)  At the meeting, Kratville and Welke agreed to shut down EMHC and to return all investor money.  (*Id.* ¶ 14.)

Kratville did not disclose this direction to investors. Instead, at a meeting of EMHC investors, he announced that while the State of Nebraska had issues with how the Elite Pools were set up, there was nothing wrong.  (Filing No. 100-3 ¶ 19.)  Kratville, Arrington and Welke sent out two letters to investors on July 5, 2006.  The first stated that pursuant to cooperation with the NDBF, the investment clubs would be closed, and the account balance was being returned to the investor.  The second letter to investors, that was not provided to the NDBF, stated that with the dissolving of the Elite Pools, the investor was now joining NIC, LLC, and the investor's account balance would simply roll over. Kratville provided no evidence that he or any principal of EMHC ever disclosed NDBF's directions to investors.

The undisputed evidence demonstrates that the "overall message" and the "common understanding of the information conveyed" to investors while recruiting and managing the Elite and MJM pools was deceitful. *R.J. Fitzgerald,* 310 F.3d at 1328. Although Kratville attempts to distance himself from the actual misrepresentations, there is no evidence to suggest he lacked knowledge of the deceit. He omitted information regarding the structure of the Elite Pools, their connection to FXIG, and regulatory direction that resulted from

25

meetings with the NDBF.  The evidence before the Court demonstrates that there is no genuine dispute as to whether Kratville made misrepresentations and omissions. Accordingly, the first element is satisfied.

### B.  Scienter

The record demonstrates that Kratville acted with scienter.  The Eighth Circuit has defined "scienter" as a mental state embracing "the intent to deceive, manipulate, or defraud."  *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 653 (8th Cir. 2001).  The CFTC does not need to prove that Kratville acted with an evil motive or direct intent to cause injury; rather, severe recklessness is sufficient to satisfy the scienter requirement.  *See R.J. Fitzgerald*, 310 F.3d at 1330; *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002).  Severe recklessness "is limited to 'highly unreasonable omissions or misrepresentations' involving 'an extreme departure from the standards of ordinary care, and ... present[ing] a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'"  K-Tel Int'l, 300 F.3d at 893 (quoting *K & S P'ship v. Continental Bank, N.A.,* 952 F.2d 971, 978 (8th Cir. 1991)).

The CFTC has presented uncontroverted evidence of scienter. For example, Kratville admitted that if he told people about FXIG, no one would invest with the Elite Pools.  Further, Kratville has not controverted that as FXIG began to fail, there were outstanding withdrawal requests that could not be honored. Around that time, Kratville told potential and current investors that the investment club was doing well, and that there had never been a loss, despite his knowledge that FXIG had posted significant losses.

Kratville's correspondence with Arrington and Welke regarding the NDBF investigation plainly demonstrate scienter. After receiving the NDBF inquiry, Kratville

recommended that an attorney's advice be disregarded, stating "I think the better course of action is to not refund the monies at this time and try and stretch out the discussion process as long as possible (I have some ideas on that) until the point where [they] likely [will] tell us to shut down.... I am curious whether we need to consider LPs in just another state or whether we need to even move it offshore. Just an idea."  (Filing No. 102-6 at ECF 41.) Kratville, Welke, and Arrington followed through with this scheme and created MJM and the NIC Pools.  On August 18, 2006, Kratville emailed Arrington and Welke, stating "it is quite clear to me that if the State ever finds out we have the Wyoming entity and we have moved everyone over, that they will go after our nuts." (Filing No. 102-6 at ECF 44.) Kratville advised that, "in an abundance of caution, I deleted everything on my computer that refers to FXIG or Elite. If the state would ever come grab our computers, the less on them the better. I would advise us to store any such documents on little zip drives, portable drives, on Hotmail or Yahoo accounts, etc." (*Id.*) He further stated he did not "have any of our emails in" his Outlook, and "[b]etter safe than sorry." (*Id.*)  These statements evidence an intent to keep the scheme in place as long as possible and avoid detection as long as possible.

In February 2007, upon learning that FXIG would return less than a penny on the dollar (Filing No. 103-3 at ECF 2), Kratville emailed Arrington and Welke that he was "frustrated because we are handling ot[he]r peoples' money and basically have had to hide these problems from our investors." (Filing No. 102-6 at 68.)  In the same month, while discussing ways to try to recover the money, Kratville stated in an email to Arrington and Welke that he feared that "someone will find out that we have been acting illegally too. If this thing blows up, I will lose my bar license....  My other fear is that if th[is] blows up that I will lose all of my assets paying our members. Playing hardball cou[l]d result in [the] state and feds finding out what we were doing...."  (Filing No. 102-6 at 71.)

27

The undisputed evidence shows that Kratville's actions and statements to potential investors and to his partners reflected the intent to deceive, manipulate, or defraud. Kratville purposely made, or permitted to be made, statements embracing inaccurate representations of the status of the Elite Pools.  Hee continued to make these statements after it became evident that FXIG's returns could no longer sustain the promises made in the Elite Pool's marketing materials, and after the NDBF investigated EMHC.  Kratville's statements to his partners demonstrated that he was at least reckless in his representations.  Accordingly, the undisputed elements demonstrate that the scienter element is met.

### C.    Materiality

 "A representation or omission is 'material' if a reasonable investor would consider it important in deciding whether to make an investment." *R.J. Fitzgerald & Co.*, 310 F.3d at 1328-29 (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).  Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. *See In re Commodities Int'l Corp.,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,943 at 44,563–64 (CFTC Jan. 14, 1997) (finding that misrepresentations and omissions to customers were material and fraudulent because customers could not properly evaluate their circumstances with regard to risk of loss and opportunity for profit).

The evidence demonstrates that Kratville's misrepresentations and omissions were material.  For example, reasonable investors would want to know accurate reports about the profitability and risk of their investments. *See R.J. Fitzgerald & Co.*, 310 F.3d at 1330 ("It is too obvious for debate that a reasonable listener's choice-making process would be substantially affected by emphatic statements on profit potential."). Kratville misrepresented

28

the Elite Pools' returns and profitability as late as 2006 and 2007. He misrepresented the risks involved, and investors' ability to withdraw funds from the Pools. He also misrepresented the identity of the Elite Pools' brokers. He failed to disclose that Pool funds were being sent out of the country, and failed to disclose the requirements imposed by the NDBF. Accordingly, the third element has been established by uncontroverted evidence.

Accordingly, Kratville committed fraud in violation of the CEA by making direct and indirect misrepresentations to potential and existing investors regarding the characteristics of the Elite Pools; and by omitting facts about the Elite Pools and its dealings with other investment groups and with the NDBF. He made the misrepresentations and omissions with scienter, and they were material.

## III.    Delivery of False Statements

There are few elemental differences between the CFTC's various fraud claims.  See *CFTC v. R.J. Fitzgerald,* 310 F.3d at 1328 (analyzing the same elements for fraud claims under the CEA and implementing regulations).  Kratville has not addressed the merits of the individual fraud claims, and instead generally disputes that he engaged in fraudulent behavior.

The evidence demonstrates that from at least July 2006 until February 2007, Elite and NIC Pool participants received statements reporting incorrect trading returns.  For example, NIC Pool participants received statements for the first three months of 2007 showing positive returns and no loss of principal. The statements showed a 3.20% return for January, 3.30% for February, and 4.50% for March.  The total balance that Defendants reported to all pool participants was approximately $5.1 million in January 2007, $5.3 million in February 2007, and $5.8 million in March 2007. The NIC Pool's actual results were,

29

taking into account the loss at FXIG in February 2007, 6% in January 2007, -79.27% in February 2007, and 6% in March 2007.

The evidence also demonstrates Kratville acted with scienter. Early in 2007, he worried about what the Defendants would report to investors. He said, "The idea of doing an April 1st report scares the hell out of me," and he mentioned that April 1st was a "ticking time bomb." (Filing No. 102-6 at ECF 68, 69, and 73.) On April 18, 2007, he emailed Arrington and Welke that, based on their concerns as to whether they could ever withdraw money from FXIG, they should post something on the website that "won[']t arouse a lot of suspicion" such as: "In auditing all 3 of our traders' information for the first quarter, we have a few questions that we want to go over with one of our traders and after we do so, we may post a different number for the quarter." (Filing No. 102-6 at ECF 89.) NIC Pool participants then received statements reporting 3.01% growth for April 2007, 3.04% growth for May 2007, and 3.03% for June 2007, although the pool suffered substantial losses in each of those months. In discussing what returns to report to investors, Kratville cautioned the other Defendants that they still had "some major questions that we need to feel good about especially if we are reporting 3.02% and that turns out to be a bad number." (Filing No. 102-6 at ECF 51, 60.) Accordingly, the CFTC has demonstrated that Kratville caused the delivery of false statements to pool participants, and did so with scienter, in violation of 7 U.S.C. § 6b(a)(2) (2006).

## IV.    Fraud by a Commodity Pool Operator

The CFTC alleges that Kratville committed commodity pool fraud in violation of 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41. To succeed on this claim, the CFTC must demonstrate that Kratville committed fraud as an associated person ("AP") of a commodity

pool operator ("CPO"). The evidence demonstrates that EMHC and MJM were CPOs, and Kratville committed fraud as an AP of the CPOs.

### A.   EMHC and MJM were Commodity Pool Operators

A CPO is defined as:

[A]ny person engaged in a business that is of the nature of an investment trust, syndicate, or similar form of enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property . . . for the purpose of trading in any commodity for future delivery or commodity option on or subject to the rules of any contract market . . . .

Regulation 1.3(cc), 17 C.F.R. § 1.3.

EMHC and MJM pooled participants' funds for at least four different commodity investment pools; they purported to trade the pooled funds together in futures commodity options; and they told participants that their individual returns equaled the pool's return. Accordingly, EMHC and MJM were CPOs under the CEA and its regulations.

### B.   Kratville was an Associated Person of a Commodity Pool Operator

Under Regulation 1.3(aa)(3), 17 C.F.R. § 1.3(aa)(3) an AP of a CPO is any natural person associated with a CPO as "a partner, officer, employee, consultant, or agent (or any natural person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation of funds, securities, or property for participation in a commodity pool or (ii) the supervision of any person or persons so engaged."   It is undisputed that Kratville was an officer and agent of EMHC and MJM and solicited funds on behalf of both EMHC and MJM.  Accordingly, Kratville was an AP of a CPO under the CEA.

### C.   Fraud as the Associated Person of a Commodity Pool Operator

The CEA broadly prohibits fraudulent transactions by a CPO, and an AP of a CPO. 7 U.S.C. § 6o(1). Courts have stated that the same conduct that violates 7 U.S.C.§ 6b also violates 7 U.S.C. § 6o(1)(A). *See, e.g.*, *CFTC v. Driver*, 877 F.Supp.2d 968, 979 (C.D. Cal.

2012); *CFTC ex rel. Kelley v. Skorupskas*, 605 F.Supp. 923, 932 (E.D. Mich. 1985).  "The primary difference is that unlike Sections 4b and 4o(1)(A) of the CEA, Section 4o(1)(B) has no scienter requirement."   *Driver*, 877 F.Supp.2d at 979 (citations omitted); *see also Commodity Trend Serv. v. CFTC*, 233 F.3d 981, 993 (7th Cir. 2000). The language in Regulation 4.41(a)(1) and (2), 17 C.F.R. § 4.41(a)(1) & (2) (2013), is substantially the same as that contained in 7 U.S.C. § 6o(1).   Accordingly, for the reasons discussed above, Kratville fraudulently made misrepresentations, and issued false statements in violation of 7 U.S.C. § 6o and 17 C.F.R. § 4.41(a).

## V.       Fraud in Connection with Options

The CEA and its implementing regulations in place at the time Kratville committed fraud also prohibit fraud in connection with options.  7 U.S.C. § 6c(1); 17 C.F.R. § 33.10 (repealed June 26, 2012).  The same elements supporting a fraud claim under 7 U.S.C.  § 6b support a claim under 7 U.S.C.  § 6c(1) and 17 C.F.R. § 33.10. *See R.J. Fitzgerald*, 310 F.3d at 1328 (laying out the same test for fraud under the CEA for both 7 U.S.C. § 6b of the CEA as well as 17 C.F.R. § 33.10); see also *CFTC v. Aurifex Commodities Research Co.*, 1:06–CV–166, 2008 WL 299002, at *6 (W. D. Mich. Feb. 1, 2008) ("The conduct of [the defendants] that violates section 4b(a) of the Act also constitutes a violation of section 4c(b) of the Act and Regulation 33.10."). Accordingly, for the reasons stated above, the evidence demonstrates that Kratville committed fraud in connection with options.

## VI.       Failure to Register as an Associated Person of a Commodity Pool Operator

Kratville admits that he never registered with the CFTC as an associated person ("AP") of a commodity pool operator ("CPO").  The CEA states:

> It shall be unlawful for any person to be associated with a commodity pool operator as a partner, officer, employee, consultant, or agent (or any person occupying a similar status or performing similar functions), in any capacity

that involves (i) the solicitation of funds, securities, or property for a participation in a commodity pool or (ii) the supervision of any person or persons so engaged, unless such person is registered with the Commission under this chapter as an associated person of such commodity pool operator and such registration shall not have expired, been suspended (and the period of suspension has not expired), or been revoked.

7 U.S.C. § 6k(2).

Kratville claims that he did not violate the CEA's registration requirement because Arrington and Welke did not follow his advice.  Kratville claims that he advised Arrington and Welke in 2005 that Elite Members should have their own accounts with FXIG.  Kratville claims that had Arrington and Welke followed this advice, the only CPO would have been FXIG, and not the Elite Pools. Kratville essentially admits that the Elite Pools triggered the registration requirement, but he suggests he should be absolved from the requirement because he did not agree with the pools' structure. This argument is unavailing, in part because there is no scienter element in § 6k(2).  It is undisputed that Kratville was a person involved in the solicitation of funds for a commodity pool, and failed to register as an AP. Accordingly, Kratville violated § 6k(2).

## VII.   Control Person of EMHC and MJM

Kratville will be jointly and severally liable for the violations of EMHC and MJM as a controlling person.  A "controlling person" of an entity is liable for that entity's violations of the CEA if the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.  7 U.S.C. § 13c(b).  The CFTC bears the burden of proving that the controlling person violated the CEA.  *Id.*  Section 13(b) imposes liability on one "who, directly or indirectly controls any person who has violated any provision of this Act [or the regulations] . . . to the same extent as such controlled person" provided the CFTC proves that the "controlling person did not act in good faith or knowingly

33

induced, directly or indirectly, the acts constituting the violation."  "A fundamental purpose of Section 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as the corporation itself." *JCC, Inc. v. CFTC*, 63 F.3d 1557, 1567 (11th Cir. 1995) (quoting *In re Apache Trading Corp.*, Comm. Fut. L. Rep. (CCH) ¶ 25,251 at 38,794 (CFTC Mar. 11, 1992) (citation omitted).

A person is a controlling person when he or she has "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." *In re Spiegel*, Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,765 n.4 (CFTC Jan. 12, 1988); *see also Lustgraaf v. Behrens*, 619 F.3d 867, 873 (8th Cir. 2010) (stating that the control person statute is to be interpreted liberally "as requiring only some indirect means of discipline or influence short of actual direction to hold a controlling person liable") (interpreting similar control person liability statute under Securities Exchange Act).  It is the person's "power that matters, not whether he exercised it by actually participating in or benefitting from the illegal acts." *Monieson v. CFTC*, 996 F.2d 852, 860 (7th Cir. 1993); *see also Metge v. Baehler*, 762 F.2d 621, 631 (8th Cir. 1985) (rejecting the "culpable participation" requirement for control person in the securities law context). A controlling person "knowingly induced" the conduct if he "had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." *R.J. Fitzgerald*, 310 F.3d at 1334.

To establish the "knowing inducement" element of the controlling person violation, the CFTC must show that the "the controlling person had actual or constructive knowledge of the core activities that constitute the violation at issue and allowed them to continue." *JCC, Inc.*, 63 F.3d at 1568.  Controlling persons cannot avoid liability by deliberately or

recklessly avoiding knowledge about potential wrongdoing. *See In re Spiegel*, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,103 at 34,767 (CFTC Jan. 12, 1988). Constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. *See JCC, Inc.*, 63 F.3d at 1568. To support a finding of constructive knowledge, the CFTC must show that a defendant "lack[ed] actual knowledge only because [he] consciously avoided it." *Id.* at 1569 (citations omitted). Hence, a controlling person need not actually exercise the power to control unlawful conduct or participate in illegal acts; it suffices if he enjoys the ability to do so, has actual or constructive knowledge of the violations, and refrains from acting. *See Monieson,* 996 F.2d at 860.

Kratville is liable as a controlling person under 7 U.S.C. § 13c(b) with respect to EMHC's and MJM's violations. EMHC's and MJM's default judgment, entered contemporaneously with this Order, serves as the predicate source of liability for Kratville's control person liability.[9] Kratville admits he was an owner and officer of EMHC and MJM. The evidence demonstrates that he jointly operated EMHC and MJM, and jointly selected traders and financial institutions used by EMHC and MJM. He solicited pool participants, held meetings with pool participants, and represented to various pool participants and prospective pool participants that he was an owner and officer of EMHC and MJM. He also served as legal counsel for EMHC and the Elite Pools, and represented them before the NDBF. Kratville's arguments that his partners ignored his advice are unavailing. After allegedly ignoring his advice, Kratville continued to solicit funds and make representations to potential investor and current customers. Unquestionably, Kratville "exercised general control over the operation of the entity principally liable *and* possessed the power or

---

[9] As noted in the default judgment, EMHC and MJM are also liable for the acts, omissions, or failures of their agents, including Kratville, pursuant to 7 U.S.C. § 2(a)(1)(B), and 17 C.F.R. § 1.2 (2013).

ability to control the specific transaction[s] or activit[ies] upon which the primary violation[s] w[ere] predicated." *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002) (internal quotation marks omitted; emphasis in original). For these reasons, and the reasons stated above, Kratville is liable as a controlling person for violations of the CEA committed by EMHC and MJM.

## VIII.   Remedies and Damages

### A.   Permanent Injunction

The CEA empowers the CFTC to seek permanent injunctive relief and states in pertinent part:

> Whenever it shall appear to the [CFTC] that any registered entity or other person has engaged in, is engaging in, or is about to engage in any act or practice constituting a violation of any provision of this Act or any rule, regulation or order, thereunder . . . the [CFTC] may bring an action in the proper district court of the United States, . . . to enjoin such action or practice, or to enforce compliance with this Act, or any rule, regulation or order thereunder….

7 U.S.C. § 13a-1(a).

In granting an injunction, "the ultimate test ... is whether the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future." *CFTC v. Wilshire Inv. Management Corp.*, 531 F.3d 1339, 1346 (11th Cir. 2008) (quoting *SEC v. Caterinicchia*, 613 F.2d 102, 105 (5th Cir.1980)). In evaluating whether to grant an injunction, the Court may consider the following factors:

> [T]he egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.; see also SEC v. Cohen*, 2007 WL 1192438, at *19 (E.D. Mo. 2007). These factors favor granting the requested injunction against Kratville.

The scope of the injunctive relief can be tailored to meet the circumstances of the violations shown. For example, upon the CFTC's showing of a violation, courts have entered permanent injunctions against future violations of the CEA.  *See, e.g., CFTC v. U.S. Metals Depository Co.,* 468 F. Supp. 1149 (S.D.N.Y. 1979).  Broader injunctions prohibiting trading activity, in addition to enjoining defendants from future violations, may also be warranted. *See, e.g., Wilshire Inv. Mgmt. Corp.*, 531 F.3d at 1346 (upholding the district court's permanent injunction prohibiting the defendants from "engaging in any commodity-related activity").  Under these standards, permanent injunctive relief, including a comprehensive trading ban, is warranted against Kratville, and this Court will enter a permanent injunction restraining him and any of his agents, servants, employees, assigns, attorneys, and persons in active concert or participation with them, from violating the CEA and from engaging in future trading.

**B.    Monetary Relief**

The unqualified grant of statutory authority to issue an injunction under the CEA carries with it the full range of equitable remedies, among which is the power to grant restitution.  *CFTC v. Commercial Hedge Services, Inc.*, 422 F.Supp.2d 1057, 1060 (D. Neb. 2006).   In addition, 7 U.S.C. § 13a-1(d), authorizes the imposition of civil monetary penalties.  The CFTC seeks both forms of monetary relief in this case.

**1.    Restitution**

The Court will order Kratville to pay restitution in the amount of $523,665.69, plus post-judgment interest. This amount is calculated according to the following table, taken

from the evidence (Filing No. 101-1 ¶ 26; Filing Nos. 101-2 through 101-6)[10] that Kratville has not controverted through argument or by citation to admissible evidence:

| Pool Participant | Net Gain/(Loss)[11] |
|---|---|
| Terry & Audrey Buckley | $(230,424.39) |
| Mark Hays | $(50,000.00) |
| Tony Leach | $(50,072.50) |
| Gary & Katherine McConnell | $(42,500.00) |
| Terrence & Kim Salerno | $(100,000.00) |
| Brian & Aileen Tobin | $0.00 |
| Charles Vesely III | $(35,000.00) |
| Ed & Deb Voges | $(26,389.80) |
| Dennis & Theresa Wills | $10,721.00[12] |
| **Total** | **$534,386.69** |

As a control person of MJM and EMHC, Kratville is also jointly and severally liable for the restitution obligations ordered in the Default Judgment against MJM and EMHC. The Court will order post-judgment interest on Kratville's restitution obligations which will

---

[10] The amount of loss to each victim was evaluated by Stephen B. Turley ("Turley"), a CFTC Futures Trading Investigator, as well as documents provided by Kratville during discovery and bank records. Kratville has not disputed the accuracy of the findings.

[11] The CFTC recognizes that Kratville has paid some of his victims some amounts in settlement agreements, and these amounts should lessen his restitution obligation, but these agreements, by themselves, do not preclude the CFTC from seeking and receiving restitution on behalf of his victims. *CFTC v. Commercial Hedge Services, Inc.*, 422 F.Supp.2d 1057, 1060-61 (D. Neb. 2006).Turley's affidavit accounts for known amounts that Arrington and Kratville paid to these particular victims.

[12] Stephen Turley's affidavit indicates that Dennis and Theresa Wills deposited $75,000 after being solicited by Kratville, and received payments of $85,721.00, thus netting a gain of $10,721.00.

accrue beginning on the date of entry of this Order and be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006).[13] The Court has already appointed the National Futures Association as Monitor in this case. (Filing No. 85.) The Monitor will collect restitution payments from Kratville and will make distributions as set forth in the order section below.

### 2.    *Civil Monetary Penalty*

The CEA provides that "the [CFTC] may seek and the court shall have jurisdiction to impose, on a proper showing, on any person found in the action to have committed any violation [of the CEA or Regulations] a civil penalty." 7 U.S.C. § 13a-1(d). Under, § 13a-1(d)(1)(A), and 17 C.F.R. § 143.8(a)(1), for the time period at issue in this case, the civil monetary penalty shall be not more than the greater of $130,000 for each violation of the CEA or triple the monetary gain to the Defendants.

The CFTC has set forth several factors to consider in assessing a civil monetary penalty. These factors include: the relationship of the violation at issue to the regulatory purposes of the CEA and whether or not the violations involved core provisions of the CEA; whether scienter was involved; the consequences flowing from the violations; financial benefits to a defendant; and harm to customers or the market. *In re Grossfeld*, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,921 at 44,467-8 (CFTC Dec. 10, 1996), *aff'd*, 137 F.3d 1300 (11th Cir. 1998). Civil monetary penalties should "reflect the abstract or general seriousness of each violation and should be sufficiently high to deter future

---

[13] The Court's January 22, 2013 Consent Order of Permanent Injunction Against Welke (Filing No. 85) imposed a $257,000 disgorgement obligation. The restitution obligations imposed against Kratville shall be offset or credited by any disgorgement amount paid by Welke. Similarly, any restitution amount paid by Kratville pursuant to any order of this Court should be offset or credited against the restitution obligations imposed herein.

violations," which means that civil monetary penalties should make it financially detrimental to a defendant to fail to comply with the CEA and Regulations so that the defendant would rather comply than risk a violation. *Id.*

This case warrants the imposition of a civil monetary penalty against Kratville because he knowingly engaged in fraud, which is a core violation of the CEA. *See Grossfeld*, ¶ 26,921 at 44,467 & n. 28 (citation omitted). Specifically, Kratville knowingly engaged in an illegal scheme by, *inter alia*, making material misrepresentations, concealing material facts from investors, and issuing false account statements. The Court concludes that a civil monetary penalty in the total amount of $1,170,000 against Kratville, is justified in this case. Rather than unbundle the violations alleged with respect to each of the testifying investors, the Court will treat Kratville's dealings with each of the testifying investors as a single violation of the CEA, and consequently determines $130,000 in civil monetary penalty to be a reasonable penalty assessment for each of the nine testifying investors, listed above.

Kratville, as a control person of EMHC and MJM, is also jointly and severally liable for EMHC's and MJM's civil monetary penalty ordered in the Default Judgment issued in this case. *See* 7 U.S.C. § 13c(b). Post-judgment interest on this civil monetary penalty shall accrue beginning on the date of entry of this Order and shall be calculated using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961 (2006). Defendants shall follow the instructions for remitting payment for the civil penalty according to the order section, below.

## CONCLUSION

For the reasons discussed above, the undisputed evidence demonstrates that Kratville committed fraud under the Commodity Exchange Act and failed to register as an

40

Associated Person of a Commodity Pool Operator.  Accordingly, the Commodity Futures Trading Commission is entitled to judgment as a matter of law.

IT IS ORDERED:

1.  The Motion for Summary Judgment (Filing No. 97), filed by the Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC") against Defendant Michael B. Kratville ("Kratville"), is granted;

2.  Kratville and any of his agents, servants, employees, assigns, and attorneys, and any persons in active concert or participation with him who receive actual notice of this Order by personal service or otherwise, are permanently enjoined from directly or indirectly:

    a.  violating 7 U.S.C. § 6b(a)(2)(A)-(C) (2012); 7 U.S.C. § 6o(1) (2012); and 7 U.S.C. § 6c(b); and 17 C.F.R. §§ 4.21, 4k(2), & 4m(1) (2013);

    b.  trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012);

    c.  entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in 17 C.F.R. § 1.3(hh) (2013)) (commodity options), and/or foreign currency (as described in 7 U.S.C. § 2(c)(2)(B) and 2(c)(2)(C)(i)) (2012) (forex contracts), for their own personal account or for any account in which they have a direct or indirect interest;

    d.  having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

    e.  controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts;

    f.  soliciting, receiving, or accepting any funds from any person for purposes of purchasing or selling any commodity futures, options on commodity futures, commodity options, security futures products and/or forex contracts;

    g.  applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2013); and/or

    h.  acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2013)), agent or any other officer or employee of any person (as that

term is defined in 7 U.S.C. § 1a)   registered, exempted from registration or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2013);

3. Kratville is ordered to pay restitution in the amount of $534,386.69, plus post-judgment interest, according to the following table:

| | |
|---|---|
| Terry & Audrey Buckley | $230,424.39 |
| Mark Hays | $ 50,000.00 |
| Tony Leach | $ 50,072.50 |
| Gary & Katherine McConnell | $ 42,500.00 |
| Terrence & Kim Salerno | $100,000.00 |
| Charles Vesely III | $ 35,000.00 |
| Ed & Deb Voges | $ 26,389.80 |
| **Total** | **$534,386.69** |

a.  Post-judgment interest on Kratville's restitution obligation shall accrue beginning on the date of entry of this Memorandum and Order, and accompanying Judgment, and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Memorandum and Order, and accompanying Judgment, pursuant to 28 U.S.C. § 1961 (2006);

b.  Kratville shall make his restitution obligation payments payable in the name of EMHC/MJM Settlement Fund and shall send such restitution payments by either electronic funds transfer or by U.S. postal money order, certified check, bank cashier's check, or bank money order to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois, 60606, under a cover letter that identifies the paying Defendant and the name and docket number of this proceeding.   Kratville shall simultaneously transmit copies of the cover letter and the form of payment to (a) Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581; (b) Director, Division of Enforcement, at the same address, and (c) Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address;

c.   The National Futures Association ("Monitor") shall oversee Kratville's restitution obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Kratville's customers identified by the CFTC or may defer distribution until such time as the Monitor may deem appropriate.  In the event that the amount of restitution payments to the Monitor are of a *de minimis* nature such that the Monitor determines that the administrative costs of making a restitution distribution to eligible customers is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the CFTC following the instructions for civil monetary penalty payments set forth below;

d.   To the extent that any funds accrue to the U.S. Treasury as a result of Kratville's restitution obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth in the preceding paragraphs;

e.   Kratville shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary to identify customers to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any restitution obligation payments.  Kratville shall execute documents necessary to release funds that he has in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the restitution obligation;

f.   Any amount paid to any customer pursuant to this Memorandum and Order, and accompanying Judgment, shall not limit the ability of that customer to prove independently in a separate action that a greater amount is owed from Kratville or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under federal, state, or common law to assert a claim for recovery against Kratville, subject to any offset or credit that Kratville may be entitled to claim under the law governing that customer's claim;

g.   Under Rule 71 of the Federal Rules of Civil Procedure, each customer of Kratville who suffered a loss is hereby explicitly made an intended third-party beneficiary of this Memorandum and Order, and accompanying Judgment, and may seek to enforce compliance with this Memorandum and Order, and accompanying Judgment,  to obtain satisfaction of any portion of the restitution amount that has not been paid, to ensure continued compliance with any provision of this Memorandum and Order, and accompanying Judgment, and to hold Kratville in contempt for any violations of any provision of this Memorandum and Order, and accompanying Judgment;

h.   Any acceptance by the CFTC or the Monitor of partial payment of Kratville's restitution and/or civil monetary penalty obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Memorandum and Order and accompanying Judgment, or a waiver of the CFTC's right to seek to compel payment of any remaining balance;

4.   Kratville shall pay a civil monetary penalty of $1,170,000, representing the regulatory permitted amount of $130,000 for each of nine violations, through the following procedure:

a.   Kratville shall pay his civil monetary penalty by electronic funds transfer, or by U.S. Postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made other than by electronic funds transfer, the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
ATTN:  Accounts Receivables --- AMZ 340
E-mail Box: 9-AMC-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-5644

b.   If payment is to be made by electronic funds transfer, Kratville shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions;

c.   Kratville shall accompany payment of the penalty with a cover letter that identifies the paying Defendant and the name and docket number of the proceedings. Kratville shall simultaneously transmit copies of the cover letter and the form of payment to the Director, Division of Enforcement, U.S. Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, and the Chief, Office of Cooperative Enforcement, Division of Enforcement, at the same address;

d.   Any acceptance by the CFTC or the Monitor of partial payment of Defendant Kratville's restitution and/or civil monetary penalty obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Memorandum and Order, and accompanying Judgment, or a waiver of the CFTC's right to seek to compel payment of any remaining balance;

44

> e. Post-judgment interest on this civil monetary penalty shall accrue beginning on the date of entry of this Memorandum and Order, and accompanying Judgment, and shall be calculated using the Treasury Bill rate prevailing on the date of this Order pursuant to 28 U.S.C. § 1961 (2006);

5. Kratville is jointly and severally liable as a control person of Defendants EMHC and MJM for the restitution obligation, in the amount of $3,833,982.02, including post-judgment interest;

6. Kratville is jointly and severally liable as a control person of Defendants EMHC and MJM for the civil penalty, in the amount of $2,872,039.89, imposed against Defendants EMHC and MJM, in the Court's Order of Default Judgment, including post-judgment interest; and

7. A separate judgment will be entered.

Dated this 28th day of January, 2014.


BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge